[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 2, 2008
THOMAS K. KAHN
CLERK

No. 07-10659

_____

D. C. Docket No. 02-00110-CV-CDL

WILLIAM MARK MIZE,

Petitioner-Appellant,

versus

HILTON HALL, Warden,
Georgia Diagnostic and
Classification Prison,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(July 2, 2008)

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

ANDERSON, Circuit Judge:

Mark Mize, a death-sentenced prisoner in Georgia, appeals the district

court's denial of his federal habeas petition. The district court concluded that

Mize's prosecutorial misconduct claim was procedurally defaulted; that the

Georgia Supreme Court's resolution of his Brady claim was neither contrary to nor

an unreasonable application of Supreme Court precedent; and that Mize has not

made out a claim of actual innocence. For the reasons detailed below, we affirm.

## I. Facts

On direct appeal, the Georgia Supreme Court summarized the facts of Mize's

case as follows:

> Viewed in the light most favorable to the verdict, the evidence adduced at trial showed that Mize was the leader of a small group, similar to the Ku Klux Klan, called the National Vastilian Aryan Party (NVAP). Witnesses testified that Mize made all the decisions for the NVAP. Several witnesses also testified that Mize displayed a single-shot 12-gauge shotgun at an NVAP meeting and told the members that the shotgun was the kind of weapon that the group would use because it could not be traced. Several of Mize's friends and co-workers were members of the NVAP, or in the initiation process. Eddie Tucker, the victim, had filled out an application form but was not a full member.
>
> On Saturday, October 15, 1994, several NVAP members and applicants gathered at Mize's home after Mize got off from work. Those present were Mize, Mark Allen, Chris Hattrup, Brian Dove, Samantha Doster (Mize's girlfriend), and Tucker. Mize told Doster that the group was going camping that night and they all got in Mize's car. When they were driving, Mize told the group that there was a crack house in Athens that he wanted "gotten rid of." Mize stated that he wanted Hattrup and Tucker to set the house on fire, and they stopped at a convenience store and bought a can of lighter fluid. Hattrup and Tucker were dropped off near the house but their attempt to set it on fire was unsuccessful. When they rejoined the group,

2

Hattrup told Mize that he needed to talk with him. Hattrup also said, referring to Tucker, that they "didn't need anybody around that couldn't follow orders."

After spending an hour at a bar, Mize drove the group to a wooded area in Oconee County. Dove and Doster were given camping gear to carry and the group set out into the woods. No one had a flashlight even though it was night. Tucker was in the lead, followed by Mize, Allen, Doster, Dove and Hattrup. After they had gone only a short distance, Hattrup passed Dove and Doster and moved up the trail to talk with Allen and Mize. Mize told Allen to stop Dove and Doster from continuing into the woods. At this point, Tucker, Hattrup and Mize were out of sight in the woods ahead of Allen, Dove and Doster. There was a shot, and Tucker exclaimed, "My God, what did you do that for?" There was a second shot. Doster heard Hattrup ask Mize if he had the gun and Mize replied, "No, man. I thought you had it." Hattrup stated, "No. He took it away from me," and Mize said, "If you can't finish it I can." Allen left Dove and Doster and moved up the trail. Dove and Doster heard a discussion among Mize, Allen, and Hattrup about muscle spasms and how Tucker was still moving. There was a third shot.

Dove and Doster ran back to Mize's car. Mize emerged from the woods holding a shotgun and trying to break it down. Once in the car, Mize asked everyone if they knew why it was done. Everyone nodded agreement. Mize told the group that the same thing could happen to them if they ran their mouth. Mize also told the group that, if asked about Tucker, they should say that they had dropped him off at a convenience store. While they were driving, Allen and Hattrup noticed that the barrel of the shotgun had shattered so they stopped at a bridge and threw the gun in a river. Later, Mize confided to Doster that he had finished Tucker off by shooting him in the head.

The police discovered Tucker's body several days later. He had been shot in the back, chest and head with a shotgun. The medical examiner testified that the back and chest wounds were inflicted by a shotgun fired at close range. The victim's head exhibited widely

scattered pellet wounds that failed to penetrate the skull; the head wounds were consistent with a close-range shotgun blast that had shattered the barrel. The medical examiner further testified that the shots to the back and chest tore through the victim's right lung, but that none of the wounds were immediately fatal. The victim's death was due to blood loss, and it could have taken him several minutes to die. A fragment of the shotgun barrel was discovered about two feet from the body's location; the gun was not recovered.

After the body was discovered but before anyone was arrested, Chris Hattrup showed his roommate, Paul McDonald, the newspaper article about Tucker's death and told him what had happened. When the crack house failed to burn, Mize asked how Tucker had done and Hattrup responded that Tucker "didn't do what he was supposed to do." Mize then said, "you know what we have to do." Hattrup admitted to McDonald that he shot Tucker in the back and chest, but that Tucker was still alive. He was out of ammunition, though, so he asked Mize for another shotgun shell and Mize gave it to him. Hattrup then shot Tucker in the head. Hattrup also boasted to McDonald that he was now a "hit man for the Klan."

Brian Dove told the police what he had seen and heard that night, and he later testified at Mize's trial. The other four NVAP members involved in Tucker's death were arrested. After spending a year in jail, Doster agreed to testify against the others and her charges were dropped.

Mize v. State, 501 S.E.2d 219, 223-24 (Ga. 1998).

At trial, the prosecution relied on the testimony of six principal witnesses in addition to the crime scene investigators. Brian Dove and Samantha Doster gave eyewitness accounts of the events before, on, and after October 15. Paul McDonald, Chris Hattrup's roommate, testified about Hattrup's statements

4

regarding the incident. Ronald Allen, a member of the NVAP who was not present on October 15, testified that Mize displayed a shotgun at a meeting, and that Mize displayed animosity toward Tucker at a meeting less than a month before Tucker was killed. Michael Hollis, a prospective NVAP member, also testified that Mize displayed a shotgun at a meeting. Finally, Jeremy Phillips, a resident of the supposed crack house, testified that he put out a fire on the night of October 15, and that a detective later found a can of lighter fluid on the property. The defense put on only two witnesses. Both testified that they remembered seeing Tucker at a restaurant on October 18, more than two days after he died (according to the crime scene investigators, Dove, Doster, and McDonald).[1]

The jury convicted Mize of malice murder. During the sentencing phase, Mize took the stand and, while still asserting his innocence, testified that he wanted no sentence other than death. The jury sentenced him to death on the basis of two aggravating factors: he ordered another to commit the murder, and the murder was outrageously or wantonly vile (because it was accompanied by aggravated battery). The Georgia Supreme Court determined that there was sufficient evidence for the

---

[1] The defense attempted to call Chris Hattrup, but because he had not yet finalized his plea deal, he asserted his Fifth Amendment privilege against self-incrimination. Hattrup later pled guilty to murder and received a sentence of life with no parole eligibility for twenty years. Mark Allen (who was also present on October 15) also did not testify; the record does not reveal whether he relied on his privilege or whether he was not called. Allen also later pled guilty to murder.

jury to conclude either that Mize fired one of the shots, or that he intentionally aided, abetted, or ordered the murder. Mize, 501 S.E.2d at 224. The Supreme Court denied certiorari on January 11, 1999.

After the Georgia Supreme Court affirmed his conviction and the Supreme Court denied certiorari, Mize began a series of collateral challenges to his conviction in state court. Mize filed two state habeas petitions in March 1999 with the assistance of two different attorneys; each petition was voluntarily dismissed. He filed a third state habeas petition pro se in December 1999, with some assistance from yet another attorney, Thomas Dunn of the Georgia Resource Center (GRC).[2]

While the third habeas was pending, in June 2000, Doster executed an affidavit recanting her trial testimony. Dunn attempted to amend Mize's pro se petition to add a claim of prosecutorial misconduct based on the Doster affidavit. The claim would have alleged that the prosecution violated due process by suborning perjured testimony from Doster. Mize, however, refused to allow Dunn to represent him or to amend the petition. Mize allowed the Doster affidavit to be entered into evidence, but told the court to rely solely on his pro se pleadings,

---

[2]We refer to the state habeas case filed in December 1999 as the third state habeas case. The state courts refer to this as the second state habeas, apparently referring to the first two state habeas cases (both filed in March 1999) as a single case.

6

which did not contain the prosecutorial misconduct claim.

Judge Prior, of the Butts County Superior Court, held an evidentiary hearing on the third habeas petition in February 2001. Mize represented himself. Dunn attended the hearing and again attempted to assert the prosecutorial misconduct claim on behalf of Mize. Mize again expressly refused Dunn's assistance and refused to assert the claim at the hearing. At the close of that hearing, the habeas court closed the evidence, but reserved judgment pending the disposition of an extraordinary motion for new trial that Mize had recently filed in the trial court, i.e., in the Oconee County Superior Court before Judge Stephens.

Mize had filed the extraordinary motion for new trial in July 2000, and had asserted the prosecutorial misconduct claim. Judge Stephens granted a hearing on that claim, and denied relief with respect to all the other claims. However, in early July 2001, before the hearing could take place, Mize withdrew the extraordinary motion, on the advice of his attorney John Matteson. The reasons Matteson gave to Mize (as memorialized in an extensive correspondence) are disjointed and obscure. The record shows that Matteson may have had an ulterior motive for his advice: he was scheduled to attend a prepaid conference in Jackson Hole, Wyoming on the day of the hearing, and the trial court refused to reschedule the hearing to accommodate him. After Mize withdrew the motion, Judge Stephens canceled the

7

hearing on the prosecutorial misconduct claim, in effect closing the case in Oconee County.

Back in the habeas court, Judge Prior - who had stayed the third habeas petition pending events in the Oconee Superior Court - did not act on Mize's petition for six more months. Though the Doster affidavit remained in the record, Mize never asserted the prosecutorial misconduct claim during this time. Mize also never asserted that Matteson had rendered ineffective assistance of counsel during the extraordinary motion for new trial proceeding. On January 10, 2002, Judge Prior denied the third habeas petition, finding that none of the claims in Mize's pro se pleadings had any merit. Mize filed an application for a certificate of probable cause with the Georgia Supreme Court, asserting for the first time his prosecutorial misconduct claim (among other claims).

Mize filed his federal habeas petition pro se in October 2002. Counsel was appointed and he filed an amended petition in July 2003. Only three of the claims contained therein are relevant to this appeal: the prosecutorial misconduct claim, a Brady claim, and an actual innocence claim.

While the federal case was progressing, Mize filed a fourth state habeas petition seeking to exhaust the prosecutorial misconduct claim in state court. The state habeas court denied the petition, finding that the claim was barred because it

8

could have been raised in either the extraordinary motion for new trial proceeding or in the third habeas proceeding. Also, in this fourth state habeas, Mize asserted that Matteson had been constitutionally ineffective in advising him to withdraw the extraordinary motion. The state habeas court did not address this claim in its order.

The federal district court denied Mize's federal habeas petition. First, it held that the prosecutorial misconduct claim was procedurally defaulted because it had never been exhausted in state court and was now, according to the fourth state habeas court, procedurally barred. The court also held that Mize could not demonstrate cause to excuse the default because, even if Matteson was ineffective in advising Mize to withdraw the extraordinary motion, Mize could not explain why he failed to assert the claim during the third habeas proceeding.

The district court next addressed Mize's claim that the prosecution violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), by failing to turn over six pages of notes from a pretrial interview with Samantha Doster. The Georgia Supreme Court had held that the notes were not exculpatory and had no impeachment value, and therefore did not need to be disclosed. Mize, 501 S.E.2d at 224-25. The district court concluded that this decision was not contrary to or an unreasonable application of Supreme Court precedent.

Finally, Mize asserted an actual innocence claim, relying on statements made

by Chris Hattrup in his plea colloquy, at Mize's motion for new trial hearing, and in two affidavits. The district court held that this claim was procedurally defaulted and, alternatively, without merit. Mize now appeals.[3]

## II. Prosecutorial misconduct claim

The district court concluded that Mize's claim of prosecutorial misconduct, based on Doster's recantation of her trial testimony, was procedurally defaulted. Procedural default is a mixed question of law and fact, reviewed de novo. Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998).

A claim is procedurally defaulted if it has not been exhausted in state court and would now be barred under state procedural rules. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). A procedurally defaulted claim can support federal

---

[3] Pursuant to 28 U.S.C. § 2253(c), Mize filed a motion for a certificate of appealability with the district court in March 2007. The court granted the certificate of appealability on four claims: (1) whether Mize was denied due process by prosecutorial misconduct in the preparation and presentation of Doster's trial testimony, which she later recanted (prosecutorial misconduct claim); (2) whether Mize was denied due process when the assistant district attorney engaged in prosecutorial misconduct by withholding exculpatory evidence, i.e., the notes from the pretrial interview with Samantha Doster (Brady claim); (3) whether Mize was denied due process when the state court failed to reverse his conviction in light of post-trial statements by the actual shooter that Mize did not participate in the murder (actual innocence claim); and (4) whether Mize was denied effective assistance of counsel when his trial counsel failed to adequately investigate and attempt to undermine at trial the state's theory that the murder was precipitated by a botched arson attempt. We address the prosecutorial misconduct claim in Part II of this opinion, the Brady claim in Part III, and the actual innocence claim in Part IV. Mize did not raise the last claim, ineffective assistance of counsel related to the state's arson theory, in his brief on appeal and it is therefore abandoned. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

habeas relief in only two narrow situations. First, the petitioner may demonstrate cause and prejudice. Cause exists if there was "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986). Such external impediments include evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a stage where the petitioner had a right to counsel. Id. In addition to cause, the petitioner must also show prejudice: that "there is at least a reasonable probability that the result of the proceeding would have been different" had the constitutional violation not occurred. Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003).

Even without cause and prejudice, the procedural default of a constitutional claim may be excused if enforcing the default would result in a fundamental miscarriage of justice. This exception applies if the petitioner can show that, in light of new evidence, it is probable that no reasonable juror would have convicted him. Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 867 (1995). By making this showing of actual innocence, the petitioner may overcome the procedural default and obtain federal review of the constitutional claim. Id.

Mize has procedurally defaulted his prosecutorial misconduct claim. He

11

never exhausted the claim, which would have required "raising both the factual and legal premises of the claims for relief that are now being asserted in the federal habeas proceeding." Henderson, 353 F.3d at 898 n.25. The prosecutorial misconduct claim became available in June 2000, when Doster executed her affidavit. Mize never asserted the claim in his third habeas proceeding. And, although he made the prosecutorial misconduct claim in the extraordinary motion for new trial proceeding, he withdrew the motion before the trial court could consider it. Mize thus never exhausted the claim in the Georgia courts.[4]

Furthermore, as the fourth state habeas court held, the claim is now procedurally barred under O.C.G.A. § 9-14-51. See Hill v. Jones, 81 F.3d 1015, 1022 (11th Cir. 1996) (federal court must find that claim is procedurally defaulted if it is not exhausted and the state court has held that it is procedurally barred); see

---

[4]Mize argues that he raised the prosecutorial misconduct claim in a letter sent to Judge Prior in May 2001. This letter informed Judge Prior that Matteson would be representing Mize in the habeas proceedings and asked the Judge to give Matteson "wide latitude to repair whatever legal issues . . . may have been messed up." This statement in the letter does not fairly present the prosecutorial misconduct claim to Judge Prior. See Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971) ("[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."); Ogle v. Johnson, 488 F.3d 1364, 1368 (11th Cir. 2007) (stating that a petitioner satisfies the exhaustion requirement when his claims as presented in the state petition allow "a reasonable reader" to understand the "particular legal basis and specific factual foundation" of each claim).

Furthermore, Mize's application for a certificate of probable cause did not argue that Judge Prior erred in refusing to consider the prosecutorial misconduct claim purportedly raised in the May 2001 letter. Mize's fourth habeas petition also failed to make this argument. Therefore, Mize's prosecutorial misconduct claim was not exhausted.

also Burger v. Zant, 984 F.2d 1129, 1135 (11th Cir. 1993) (holding that section 9-14-51 is independent and adequate state procedural bar).  Thus, absent one of the exceptions to the procedural default doctrine, Mize's prosecutorial misconduct claim cannot provide a basis for federal habeas relief.

Mize argues that he can demonstrate cause because he received ineffective assistance from Matteson during the extraordinary motion for new trial proceeding.  Ineffective assistance during a stage where the petitioner had a right to counsel is a valid excuse for failing to follow a state procedural rule.  Coleman v. Thompson, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 2566-67 (1991).  On the other hand, at stages where the petitioner had no right to counsel, "it is the petitioner who must bear the burden of a failure to follow state procedural rules."  Id. at 754, 111 S. Ct. at 2567.  Because a petitioner has no right to counsel during state collateral review, even grossly ineffective assistance at the collateral review stage, or no assistance at all, does not constitute cause to excuse a procedural default.  See In re Magwood, 113 F.3d 1544, 1551 (11th Cir. 1997).

Mize blames his failure to present the prosecutorial misconduct claim to the state courts on Matteson.  Mize claims that he had a right to counsel during the extraordinary motion for new trial proceeding.  He further claims that Matteson was constitutionally ineffective because there was no good reason to withdraw the

13

motion after the trial judge granted a hearing on the prosecutorial misconduct claim. Mize suggests that Matteson had a personal reason for his advice: to avoid missing the prepaid conference in Jackson Hole, Wyoming that was scheduled for the day of the hearing. Mize asserts that Matteson's ineffective assistance at a stage where he allegedly had a right to counsel should excuse his failure to present the prosecutorial misconduct claim to the state courts.

We need not address whether Mize had a right to counsel during the extraordinary motion for new trial proceeding or whether Matteson was ineffective.[5] Even if Mize prevailed on those issues, he still cannot show cause,

---

[5] We doubt seriously Mize's assertion that he had a constitutional right to counsel in the extraordinary motion for new trial proceedings. His conviction was final after the Georgia Supreme Court had affirmed his conviction, and the Supreme Court denied certiorari on January 11, 1999. Before Mize filed his extraordinary motion for new trial in July 2000, he had already filed three state habeas corpus petitions, and the third was still pending. Thus, Mize's extraordinary motion for new trial was not a proceeding which was part of the process consisting of his trial and direct appeal therefrom. Rather, it was in the nature of a collateral proceeding. And, of course, a convicted defendant has no constitutional right to effective assistance of counsel in collateral proceedings. See Coleman, 501 U.S. at 753-54, 111 S. Ct. at 2566-67 ("There is no constitutional right to an attorney in state post-conviction proceedings."); see also Pennsylvania v. Finley, 481 U.S. 551, 555, 1075 S. Ct. 1990, 1993 ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.").

Moreover, even if there were a constitutional right to counsel during the extraordinary motion for new trial proceeding, and even if Matteson were ineffective in those proceedings, Mize would nevertheless be barred from asserting that ineffectiveness as cause to excuse his procedural default. See Carrier, 477 U.S. at 488-89, 106 S. Ct. at 2646 (1986) ("[T]he exhaustion doctrine . . . generally requires that a claim of ineffective assistance [of counsel] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."). Mize failed to raise the ineffective assistance of counsel argument in his third state habeas petition. The third habeas petition was open for six months after Mize withdrew the extraordinary motion for new trial, so Mize could have amended his petition to include the ineffective assistance of counsel claim.

because he cannot explain why he did not assert the prosecutorial misconduct claim during the third habeas proceeding. The third habeas proceeding remained open for another six months after Mize withdrew the extraordinary motion for new trial, and was an appropriate forum for the prosecutorial misconduct claim. Mize thus still must show a valid explanation for why he failed to assert the claim during the third habeas proceeding.

This Mize cannot do. Mize did not have a right to counsel during the third state habeas, see Jimenez v. Florida Dep't of Corrections, 481 F.3d 1337, 1344 (11th Cir. 2007), and so is responsible for whatever errors were made in failing to assert the claim there. Nor has Mize demonstrated that any other external factor prevented him from asserting the claim during the third habeas. To the contrary,

---

Mize did raise this claim in his fourth state habeas petition. In dismissing that petition, the state habeas court did not address the ineffective assistance of counsel claim; the court ruled only that the fourth habeas was successive because Mize could have brought the prosecutorial misconduct claim in his third state habeas petition. The same reasoning defeats Mize's ineffective assistance of counsel claim. Mize had six months between the withdrawal of his extraordinary motion for new trial and the ruling on the third state habeas petition to assert his ineffective assistance of counsel claim. Georgia law bars adjudication of issues that could have been raised in an original or amended habeas petition. O.C.G.A. § 9-14-51 (2006). Mize therefore failed to exhaust his ineffective assistance of counsel claim. Because this claim is unexhausted, we must treat it as procedurally defaulted. Ogle, 488 F.3d at 1370 ( "When it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, [the court] can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.") (internal citations omitted). Therefore, Mize cannot assert ineffective assistance of counsel as cause for the procedural default of his prosecutorial misconduct claim, because the former is also procedurally defaulted.

15

Mize himself was responsible for the default. Thomas Dunn, an experienced Georgia death penalty attorney, stood ready and willing to amend the petition to make that claim. Dunn also attended the evidentiary hearing and was ready to argue the claim there. Mize repeatedly refused to let him do so.[6]

As a result, there is no causal link between Matteson's alleged ineffectiveness and Mize's procedural default. Courts have held that the procedural default cannot be excused on similar facts: where, after the alleged cause occurred, the petitioner still had an opportunity to assert the claim in state court. See Interiano v. Dormire, 471 F.3d 854, 857 (8th Cir. 2006); Dellinger v. Bowen, 301 F.3d 758, 766-67, 767 n.10 (7th Cir. 2002) (holding that even though habeas petitioner's direct appeal counsel may have been ineffective, petitioner had defaulted his underlying claim on both direct appeal and collateral attack, and the latter default could not be excused because petitioner had no constitutional right to an attorney during the collateral attack). As Mize cannot show a factor external to the defense that prevented him from presenting the prosecutorial misconduct claim in the third habeas proceeding, he cannot demonstrate cause, and the claim cannot

___

[6]Mize does not argue that he could not have raised the prosecutorial misconduct claim in the third state habeas proceeding. Therefore, he has abandoned any such argument. Moreover, the fourth state habeas court held that the claim could have been brought in the third state habeas, and Mize does not challenge that holding.

provide a basis for federal habeas relief.[7]

### III. Brady claim

Mize next argues that the prosecution failed to disclose material impeachment evidence, in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). The prosecution admittedly did not disclose six pages of part-typewritten, part-handwritten notes prepared during a pretrial interview with Samantha Doster. The Georgia Supreme Court rejected this claim on direct appeal, and the district court concluded that the decision was not contrary to or an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d)(1) (2006).

Under Brady, the prosecution must disclose, upon request, evidence that is material either to guilt or to punishment. Gilliam v. Sec'y for the Dep't of Corrections, 480 F.3d 1027, 1032 (11th Cir. 2007). Such evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). Brady requires

---

[7] Mize does not argue that the default should be excused under the fundamental miscarriage of justice exception. We consider the issue in passing in Part IV, infra, where we determine that Mize has not satisfied the standard for the fundamental miscarriage of justice exception and thus, a fortiori, has not established his freestanding actual innocence claim. See House v. Bell, 126 S. Ct. 2064, 2087 (2006).

17

disclosure of material impeachment evidence as well as material exculpatory evidence. Flores v. Satz, 137 F.3d 1275, 1278 (11th Cir. 1998).

Mize does not argue that the Doster notes had any exculpatory value. Nor could he: the notes echo Doster's trial testimony and implicate Mize in the murder. Mize instead argues that the notes had significant impeachment value.

The notes are almost entirely consistent with Doster's trial testimony. They contain all the major points from her trial testimony, reporting, for example, Mize displaying the shotgun at the NVAP meeting; the attempted burning of the crack house; the shooting itself; Mize's invention of the alibi; the disposal of the shotgun; and Mize's later admission to Doster that he finished off Tucker. Nor did the notes omit any of the salient points from Doster's trial testimony.

The only difference whatsoever between the notes and Doster's trial testimony is relatively minor. In the notes, Doster is recorded as saying that "someone" in the woods said "if you cannot do it I can," while at trial she testified that Mize said this. We acknowledge that this discrepancy may have had some impeachment value; it conceivably could have been used to suggest at trial that Doster was inventing details that tended to implicate Mize. As such, the prosecutor should have turned over the notes. However, this was not material impeachment evidence. In the first place, the impeachment value was weak. "Someone" was not

18

directly in conflict with "Mize." Because both the notes and Doster's trial testimony included the fact that Mize had later admitted guilt, the potential discrepancy between "someone" and Mize was not material. And fabrication was not the only explanation for the greater level of detail; upon reflection, and especially in light of Mize's later admission of guilt, Doster probably had simply become confident that it was Mize who had made the statement.

Further, whatever impeachment value this evidence possessed would not have added significantly to the impeachment of Doster at trial. The defense impeached Doster extensively on the basis of an alleged deal with the prosecution. The defense showed that she was released without charge after a year of imprisonment when she agreed to testify; that her story changed from an absolute denial when she was first incarcerated to the version where she implicated Mize; and that Doster had access to Brian Dove's eyewitness account before she changed her story. In closing, the defense theorized that Doster had tailored her testimony to Dove's in order to curry favor with the prosecution.[8]

In light of the fact that the defense already could show that Doster had changed from an absolute denial to a version that incriminated Mize, the change

---

[8] The defense also impeached Doster by showing that she was a longtime drug user: she had used crack and cocaine in the past and had smoked marijuana on the night Tucker was killed.

from "someone" to "Mize" would have been at best cumulative. It was certainly not impeachment evidence that, if disclosed, would have changed the result of the proceeding. As noted above, a habeas petitioner can prove a <u>Brady</u> violation only by demonstrating that there is a reasonable probability that, had the withheld evidence been disclosed to the defense, the result of the proceeding would have been different. <u>See</u> <u>Bagley</u>, 473 U.S. at 682, 105 S. Ct. at 3383. There was very strong evidence supporting the jury's verdict convicting Mize. We know that there were only two, and possibly three, people at the murder scene with the victim, Tucker. Mize and Hattrup were there, and possibly Mark Allen. We know from the overwhelming evidence in the case that Mize was the leader of the group, and that Hattrup was a follower. It was Mize who ordered Mark Allen to go back and stop Dove and Doster. It was Mize who had the gun in his hand as Mize and Hattrup came out of the woods and into the view of Doster and Dove. It was Mize who challenged the group in the car that they knew why that had happened to Tucker and warned that "if anybody runs their mouth this could happen to them." It was Mize who made up the alibi story that they were to tell if anyone asked what had happened. Even more significantly, Doster testified, and the prosecutor's notes from her interview also reflect, that Mize later admitted to her that he had finished Tucker off. Under these circumstances, there is not a reasonable probability that

20

the jury would have reached a different result had the defense had access to the prosecutor's notes. There is not a reasonable probability that the jury would have concluded that Mize did not either fire the third shot or encourage Hattrup to do so.

For the foregoing reasons, we cannot conclude that the Georgia Supreme Court erroneously rejected Mize's Brady claim. A fortiori, we cannot conclude that the Georgia Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

## IV. Actual innocence claim

Finally, Mize asserts that he is entitled to habeas relief because he has new evidence showing he is actually innocent of the crime of conviction. The function of federal habeas corpus is to redress constitutional errors, not to relitigate state criminal cases. Herrera v. Collins, 506 U.S. 390, 401, 113 S. Ct. 853, 861 (1993). Consequently, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Id. at 400, 113 S. Ct. at 860. A claim of actual innocence is normally used not as a freestanding basis for habeas relief, but rather as a reason to excuse the procedural default of an independent constitutional claim. See id. at 404, 113

21

S. Ct. at 862. Nevertheless, in <u>Herrera</u>, the Supreme Court assumed, "for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." <u>Id.</u> at 417, 113 S. Ct. at 869.

Mize claims that he has made a "truly persuasive demonstration" of actual innocence. The issue of whether such a claim is cognizable in federal habeas corpus does not arise in this case, because even if such a claim were cognizable, Mize does not qualify. Mize has fallen far short of showing that he is actually innocent. The Supreme Court, of course, has never decided what the precise burden of proof for a freestanding actual innocence claim would be. However, the Court has indicated that it would necessarily be more difficult to establish a freestanding actual innocence claim than it is to establish actual innocence under the fundamental miscarriage of justice exception to the procedural default doctrine. <u>See</u> <u>House v. Bell</u>, 126 S. Ct. 2064, 2087 (2006). To satisfy this lesser standard (which itself applies "only in the extraordinary case," <u>House</u>, 126 S. Ct. at 2077), Mize would have to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 851, 867 (1995). In other words, he would

22

have to show it is probable that, given the new evidence, no reasonable juror would have convicted him.[9]  See House, 126 S. Ct. at 2077.

Mize's new evidence does not even meet the relatively looser Schlup standard, and thus a fortiori does not establish a freestanding actual innocence claim.  Mize relies on statements made by Chris Hattrup in his plea colloquy, his testimony at Mize's motion for new trial hearing, and two affidavits (one executed in 1996, another in 2000).  At Mize's motion for new trial hearing and in the affidavits, Hattrup claimed that he was solely responsible for killing Tucker as a result of a drunken argument.

The Hattrup statements are wholly unconvincing.  In the first place, they are inconsistent with each other on one of the most important points: who fired the shots that killed Tucker.  Hattrup has at various times stated that he does not remember what happened after the first shot; that he definitely fired only one shot;

_____

[9] The district court also held that Mize procedurally defaulted his actual innocence claim because he failed to exhaust it in the state courts and it is too late to raise it now.  It is doubtful, however, that it is possible to procedurally default a freestanding actual innocence claim.  The threshold for a freestanding actual innocence claim is higher than the showing of actual innocence required to invoke the fundamental miscarriage of justice exception to the procedural default doctrine.  See House, 126 S. Ct. at 2087.  As a result, if a petitioner in fact has a freestanding actual innocence claim, he would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception.

Of course, because we hold that Mize has not come close to showing he is actually innocent, we need not decide whether a persuasive showing of actual innocence would in fact entitle a petitioner to habeas relief.

23

or that he fired all three of the shots.[10]  This internal contradiction on a crucial point suggests that, at best, Hattrup has an incomplete memory of the incident (perhaps because of his admitted drunkenness), and at worst is lying in order to help his friend Mize.

Mize does not deny that Hattrup's testimony is inconsistent with respect to who fired the bullets.  Instead, he claims that Hattrup has consistently testified that Mize did not order him to kill Tucker, which is enough to show Mize's actual innocence.  See Schlup, 513 U.S. at 327, 115 S. Ct. at 867.

But it is not true that Hattrup has consistently and unequivocally stated that Mize did not order him to kill Tucker.  At Hattrup's plea hearing, Hattrup simply

_____

[10] Hattrup has been subject to cross-examination on only one occasion: at Mize's motion for new trial hearing.  There he gave three different accounts of the shooting: that he did not remember anything after the first shot; that he in fact fired the second shot; and that he also fired the third shot.  At the same hearing, two police officers who talked to Hattrup after his guilty plea said he gave them yet another account: that he fired only once, then dropped the gun and walked away.  Dropping the gun and walking away is itself inconsistent with all of Hattrup's stories at the motion for new trial hearing: with not remembering anything after the first shot, or with firing the second shot or third shot.  Thus, on the only occasion when Hattrup was cross-examined, he in effect gave three different, mutually inconsistent versions of the incident.

Hattrup's other statements have been equally divergent.  At his plea colloquy, he admitted only to firing the first shot, and his attorney objected when the prosecutor attempted to ask who fired the second and third shots.  In the 1996 affidavit, Hattrup claimed he fired one and only one shot, which is inconsistent with his statements that he did not remember what happened after the first shot, or that he fired the second and third shots.  Finally, Paul McDonald testified at Mize's trial that Hattrup said he fired all three shots.

Hattrup has thus himself given three mutually inconsistent accounts: that he definitely fired only one shot, that he fired the second and third shots too, and that he does not remember what happened after the first shot.  The police officers gave another account: that Hattrup said he dropped the gun after the first shot. McDonald testified that Hattrup said he fired all three shots.

stated that he had fired at least one shot into Tucker, and did not know why he did it. Then, Hattrup's attorney tried to shift the blame for Tucker's death to Mize:

> Persons afflicted with [ADD] are the consummate followers. [talking about Hattrup]. They are never leaders. They're perfect followers. Doctor Shapiro also had the benefit of doing a psychological evaluation on Mr. Mark Mize and was able to say and would have testified that Mark Mize was a very good leader and had all of the qualities of being a leader which corroborates the State's view of this. So we have a young man who was already predisposed through some disabilities to be a follower.
> . . .
> I'm confident that Chris Hattrup who has never been in trouble with the law would never have been involved with nor shot unlawfully another human being but for the coming together of a number of circumstances, the egging on, the manipulation in part by Mr. Mize but for which he has real moral and legal responsibility because he, in fact, fired at least one of the shots that killed this gentleman. I think in light of what we know about Chris, his lack of prior record, the State's theory of the case and his involvement and what Doctor Shapiro has informed me about this, I believe that the interest and my client's particular interest is well served and would ask the Court to accept this plea agreement.

Hattrup's attorney in part endorsed "the state's theory of the case." This theory was, of course, that Mize ordered the shooting of Tucker. These statements made on Hattrup's behalf tend to imply Mize's guilt, not his innocence.

Hattrup made his next statement at Mize's motion for new trial hearing. He testified on direct that he was not ordered to kill Tucker, and that Mize did not cause the death. But he also testified, more equivocally, that "After the first shot I

25

pretty much went blank." Hattrup thus could not definitively rule out either of the state's theories of the case: that Mize ordered Hattrup to shoot Tucker (with the order perhaps taking place after the first shot), or that Mize fired the third shot. Hattrup also allowed his attorney to testify with respect to what he told her. She said Hattrup

> has indicated on a number of or on some occasions that he has a kind of vague recollection that someone told him after the first shot to either fire the second shot or to say something along the lines of go ahead, shoot him. He has never been able to articulate what was said, just an impression that someone was encouraging him and suggesting and promoting that he fire the second shot, never the first shot. And he has not been able to identify for me who may have made such a suggestion, if one was made, but he had believed that it would have been either Mr. Allen or Mr. Mize. But, that has been the best recollection he has ever given me about that.

Thus, Hattrup's own attorney, who had no demonstrated incentive to lie, testified that Hattrup had stated on a "number" of occasions that either Allen or Mize told him to fire the second shot. Hattrup's own testimony at the hearing could not rule out Mize's guilt, and his attorney's testimony tended to imply it.

Mize thus must rely entirely on Hattrup's affidavits to make his showing of actual innocence. In the first place, affidavits alone are not a promising way to demonstrate actual innocence. Though sworn, they are not convincing evidence of innocence because "the affiants' statements are obtained without the benefit of

cross-examination and an opportunity to make credibility determinations."
Herrera, 506 U.S. at 417, 113 S. Ct. at 869. On the only occasion when Hattrup was subject to cross-examination, at Mize's motion for new trial hearing, his testimony was hopelessly ambivalent, as related above.

In addition to the inherent weakness of affidavits as new evidence of actual innocence, these affidavits are particularly unhelpful. In the affidavits Hattrup does state that he was solely responsible for shooting Tucker as a result of a drunken argument. But this confident statement about Mize's involvement contradicts Hattrup's other, more equivocal statements. For example, at his plea colloquy, Hattrup stated that he did not know why he shot Tucker. At Mize's new trial hearing, Hattrup testified that he "went blank" after the first shot. Both statements are inconsistent with knowing, with certainty, that the shooting was caused by a drunken argument.

The affidavits also are not credible. As noted above, they contradict other statements Hattrup made with respect to how many shots he fired. They also make assertions that contradict substantial record evidence. For example, both affidavits claim that there was no plan to burn down a crack house. This contradicts the following strong evidence: Jeremy Phillips's testimony that someone tried to burn down his house on the night of October 15; Brian Dove's testimony that Mize

27

ordered Hattrup to burn down the crack house; Doster's testimony that Mize ordered Hattrup to burn down the crack house; and Hattrup's own statement, via McDonald, that Mize ordered him to burn down the crack house.

These equivocal and unreliable affidavits are all the more unconvincing when measured against the substantial evidence of Mize's guilt. Numerous witnesses testified that Mize was the head of the NVAP, had displayed a shotgun at meeting, and said it was what the organization used to conduct its business. Ronald Allen, unconnected with the Tucker shooting and himself a member of the NVAP, also testified that Mize and Allen displayed some hostility toward Tucker at a meeting. Doster, Dove, and McDonald (recounting what Hattrup told him) testified that Mize wanted the crack house burned down. Phillips corroborated the story by testifying that someone in fact tried to burn down his house. Dove and Doster gave virtually identical accounts of the shooting itself. They both also testified that Mize told the group why Tucker had been killed, threatened anyone who talked, and concocted a group alibi. Mize later even admitted to Doster that he had fired the final shot, and Hattrup also (according to McDonald) admitted that Mize had ordered the killing.

In the face of this evidence, no reasonable juror would refuse to convict Mize simply because Hattrup now claims, without support and with numerous

28

contradictions, that he was solely responsible for killing Tucker. The Hattrup evidence does not warrant invocation of the fundamental miscarriage of justice exception to the procedural default doctrine.[11] A fortiori, it cannot support a freestanding actual innocence claim (if such a claim in fact exists).[12]

## V. Conclusion

For the foregoing reasons, we affirm the district court's denial of Mize's federal habeas petition.

AFFIRMED.

---

[11] For this reason, Mize also cannot use the fundamental miscarriage of justice exception to excuse the default of his prosecutorial misconduct claim, discussed supra.

[12] Although Mize does not argue the point on appeal, the Doster affidavit recanting her trial testimony does not make his actual innocence claim any stronger. In the first place, it contradicts her detailed testimony at trial and pretrial, which itself contradicted her year-long protestations of innocence in jail. At best, then, her affidavit merely makes Doster a habitual liar and leaves the Dove, Phillips, Allen, McDonald, and Hollis testimony intact. Second, Doster is biased. She is Mize's former girlfriend and testified at trial that she wrote letters to Mize while in jail telling him that he was the "sweetest" man she had ever met. Because she was released from jail without charge, she faces no downside for recanting her trial testimony in order to help her former boyfriend. Finally, as the Supreme Court has noted, the affidavit is of inherently little value because Doster has not been subject to cross-examination as to its contents. See Herrera, 506 U.S. at 417, 113 S. Ct. at 869. Thus, even considering Doster's affidavit along with the Hattrup material, there is insufficient new evidence either to prove an actual innocence claim or to invoke the miscarriage of justice exception to the procedural default doctrine.