**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3920
_____

DOUGLAS PAUL WRIGHT,

Appellant

v.

SUPERINTENDENT SOMERSET SCI; DISTRICT ATTORNEY YORK COUNTY;
ATTORNEY GENERAL PENNSYLVANIA

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No.:  3-05-cv-00024)
District Judge:  Honorable Kim R. Gibson

_____

Argued on January 23, 2015

Before:  RENDELL, SMITH and KRAUSE, <u>Circuit Judges</u>

(Opinion filed: February 5, 2015)

Aaron J. Fickes, Esq. **(ARGUED)**
Schnader Harrison Segal & Lewis
750 9th Street, N.W.
Suite 550
Washington, DC 20006

Carl A. Solano, Esq.
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103

      Counsel for Appellant


James E. Zamkotowicz, Esq. **(ARGUED)**
York County Office of District Attorney
45 North George Street
York, PA 17401

      Counsel for Appellees Superintendent Somserset SCI, District Attorney
      York County, and Attorney General Pennsylvania

## OPINION[*]

**RENDELL**, <u>Circuit Judge</u>:

Douglas Wright appeals the District's Court denial of his habeas petition, which asserts a freestanding claim of actual innocence under 28 U.S.C. § 2254. Wright challenges his third-degree murder conviction[1] for causing the death of his son, Donovan Wright, who displayed symptoms consistent with shaken baby syndrome.[2] Wright argues that new medical evidence undermines the expert evidence on which he was convicted as to the causes and timing of his son's injuries. We conclude that, even assuming a freestanding claim of actual innocence is cognizable under § 2254, Wright cannot meet the "extraordinarily high" standard of proof required for such a claim. On that basis, we will affirm the District Court's denial of Wright's habeas petition.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] At oral argument, the appellees argued that because Wright was convicted of third-degree murder and not first-degree murder, less evidence is required to uphold Wright's conviction. Third-degree murder is defined by statute as any murder not of the first or second degree. 18 Pa. Cons. Stat. § 2502(c). Under Pennsylvania law, third-degree murder is a killing done with legal malice but without the specific intent to kill required in first-degree murder. *Commonwealth v. Kellam*, 719 A.2d 792, 797 (Pa. Super. Ct. 1998). Because this argument was raised for the first time at oral argument, it is waived. *See Pichler v. UNITE*, 542 F.3d 380, 396 n.19 (3d Cir. 2008); *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 783 (3d Cir. 2001).

[2] Both Wright and Donovan's mother were charged with first-degree murder under the theory that Donovan was a victim of shaken baby syndrome, and the government sought the death penalty against them both. Donovan's mother negotiated a plea agreement for involuntary manslaughter that required her to testify against Wright. The government dropped its attempt to seek the death penalty against Wright after jury selection.

# I.    BACKGROUND

Donovan Wright was born on December 28, 1995, to Wright and April Klinedinst. Donovan displayed abnormal behavior in the days leading up to his hospitalization on May 12, 1996. From May 2 to 6, several people, including Klinedinst, Wright's mother, and Klinedinst's co-workers, noticed a red dot in Donovan's eye and that his eyes "flew to the side," seemed "wandering" or "detached," and would "go up in the corner." (A146, A216.) On May 10, a friend, Wanda Rill,[3] watched Donovan, and he screamed and cried for five hours. Donovan "took in a deep breath and stiffened his body" when picked up, and his eyes were crossed. (A102.)[4] On May 11, Donovan would not wake up after prompting by Klinedinst, and Wright's mother noticed that Donovan was lethargic and unable to focus his eyes.

On May 12, 1996, Wright watched Donovan from 11:00 am to 7:00 pm, while Klinedinst was working. Donovan ate little and slept during the day.[5] Later that night, Wright and Klinedinst took Donovan to Wright's mother's home to babysit. Donovan was asleep in his car seat, but while they were driving, Klinedinst saw brown chunks mixed with saliva coming from Donovan's mouth and heard him making grunting noises. When Donovan was removed from his car seat, Wright's mother was concerned with

---

[3] Donovan and Klinedinst lived in a homeless shelter, during which time Klinedinst developed a friendship with a woman staying there, Wanda Rill, and her four children. Rill and Klinedinst watched each other's children at the shelter and after Klinedinst, Donovan, and Wright moved to an apartment in March 1996. Rill's children displayed violent behavior and sometimes watched Donovan without supervision.

[4] After Rill babysat, Klinedinst noticed a general change in Donovan's behavior.

[5] Donovan also bumped his head while in the shower with Wright, although according to Wright, Donovan did not suffer any injury.

how Donovan's head flopped and insisted that he be taken to the hospital. Emergency room personnel discovered leg and rib fractures that were three to six weeks old; subdural hematomas that were at least two weeks old; and skull fractures that could not be precisely dated, but likely occurred at the same time as the earlier hematomas.[6] Donovan never recovered from his injuries and died on August 5, 1997.

At trial, treating and expert medical witnesses testified that Donovan was injured during episodes of physical abuse for as long as several weeks before May 12, 1996.[7] The government sought to prove that Wright committed both the past abuse and an assault on Donovan on May 12, 1996, that caused Donovan's death.[8] Wright attempted to show that Klinedinst or others who cared for Donovan caused his earlier injuries and that Donovan's episode on May 12 was caused by a re-bleed of his preexisting hematomas, eliciting testimony through two expert witnesses.[9] Although the jury

---

[6] A "subdural hematoma" is a collection of blood on the surface of the brain. *See* MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000713.htm (last visited Feb. 5, 2015).

[7] The government had six medical witnesses testify. The thrust of their testimony was that there was recent bleeding on Donovan's brain, which was likely caused by an injury that occurred within hours of Donovan being taken to the emergency room. Furthermore, Donovan had retinal hemorrhages, which were a symptom of shaken baby syndrome, as well as macular detachment, which likely resulted from a significant force to Donovan's head by shaking or a direct impact, causing unresponsiveness within minutes or hours.

[8] The government's case against Wright was circumstantial. There were no witnesses who saw Wright abusing Donovan, and some witnesses described him as a loving father.

[9] Dr. John Adams, an expert in forensic pathology, testified that there was no evidence of shaking. Adams testified that Donovan's injuries did not necessarily originate in the hours before he was taken to the emergency room because his bleeding on the brain could be caused by a re-bleed either of older injuries or caused by minimal new trauma. Dr. Jan Leestma, an expert in pathology and neuropathology, testified that Donovan's macular separation could have stemmed from causes other than shaking and that the bleeding on Donovan's brain could have been a spontaneous re-bleed of an earlier injury.

5

acquitted Wright of first-degree murder, they did convict him of third-degree murder and lesser included charges. Wright was sentenced to 20-40 years in prison, the statutory maximum sentence.

Wright was unsuccessful on direct appeal and sought post-conviction relief. In Wright's first petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), he argued that Dr. James McManaway, an ophthalmologist who testified for the government, testified inconsistently in a later trial. In an evidentiary hearing, McManaway testified that his opinions had not changed and that he would have testified in Wright's trial the same way. McManaway's differing statements were based on the difference in the two children's outcomes—Donovan died, while the infant in the other case made a "remarkable neurologic recovery." (A1002.) The PCRA court treated this claim as one for newly discovered evidence, and it denied the petition.[10]

Wright filed a second PCRA petition arguing that newly discovered exculpatory information disproved the government's theory of the crime. Wright introduced an expert report from Dr. John Plunkett, a forensic pathologist, which focused on changes in the medical understanding of shaken baby syndrome and infant head injury between 1998 and 2007. The PCRA court concluded that, as a pathologist, Plunkett lacked the expertise to give an opinion grounded in other disciplines, such as ophthalmology, neurology, radiology, or pediatrics, or on behalf of the entire medical community. Furthermore, Plunkett's testimony was not new evidence that would have changed the

---

[10] The Superior Court agreed, and the Pennsylvania Supreme Court and the Supreme Court declined to hear the case.

6

outcome of the trial because it was similar to the testimony offered by defense experts Adams and Leestma.[11]

After Wright's second PCRA petition was denied, Wright amended his habeas petition to assert a claim of actual innocence. The District Court[12] concluded that the second PCRA court's conclusion—that Plunkett's testimony was not new evidence—was reasonable under AEDPA. The District Court stated, "Plunkett's testimony is not evidence of actual innocence, but rather of reasonable doubt. Evidence that impeaches the Commonwealth's case by positing other possible ways Donovan could have been injured is not the same as evidence that would exclude Wright as a suspect or prove that Donovan did not die as a result of the injuries inflicted on him." (A51.)

On March 18, 2014, this Court granted Wright's application for a certificate of appealability[13] on the issue of whether a claim of freestanding actual innocence is cognizable in a petition filed pursuant to 28 U.S.C. § 2254, and, if so, whether Wright has met the applicable standard.

## II. DISCUSSION

### A. Standard of Review

We review Wright's actual innocence claim de novo. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), if the state court did not reach the merits of the

---

[11] The Superior Court affirmed, and the Pennsylvania Supreme Court denied Wright's petition for allowance of appeal.

[12] The District Court adopted the Magistrate Judge's Report and Recommendation in full.

[13] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241, and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253.

7

federal claim, then it is reviewed de novo. *See Cone v. Bell,* 556 U.S. 449, 472 (2009).[14]

Here, Wright's actual innocence claim was never "adjudicated on the merits" in the state court proceedings. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The first PCRA proceeding discussed Wright's claim with regard to McManaway's inconsistent testimony as a claim for relief on the grounds of newly discovered exculpatory evidence under 42 Pa. Cons. Stat. § 9543—a different basis than a federal freestanding claim of actual innocence. The second PCRA proceeding also considered the Plunkett evidence under the newly discovered evidence standard.[15]

**B.      Cognizability of Freestanding Claim of Actual Innocence**

Currently, the Supreme Court treats actual innocence as a gateway for consideration of procedurally defaulted claims. *See McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013); *Schlup v. Delo*, 513 U.S. 298, 327-29 (1995) (requiring a showing "that it is

---

[14] In contrast, when a federal claim has been adjudicated on the merits by the state court, the federal court may only grant habeas relief if the state court's decision as to the federal claim was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In either case, the state court's relevant factual determinations are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. *Id.* § 2254(e)(1).

[15] The appellees argue that, if Wright's actual innocence claim is not entitled to AEDPA deference, then Wright has not properly exhausted his actual innocence claim. This argument is unavailing. Even if Wright did not "fairly present[]" his actual innocence claim to the state courts in a manner that put them on notice that a federal claim was being asserted, *Rainey v. Varner*, 603 F.3d 189, 198 (3d Cir. 2010); *Bronshtein v. Horn,* 404 F.3d 700, 725 (3d Cir. 2005), that procedural default would be excused if Wright had a meritorious actual innocence claim. *See Mize v. Hall*, 532 F.3d 1184, 1195 n.9 (11th Cir. 2009) ("[I]f a petitioner in fact has a freestanding actual innocence claim, he would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception."). Therefore, we will assess the merits of Wright's claim despite any failure to exhaust.

more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence"). The Supreme Court has not yet recognized the existence of a freestanding claim of actual innocence. *See McQuiggin*, 133 S. Ct. at 1931; *cf. In re Davis*, 557 U.S. 952 (2009).

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court explained that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400. The petitioner in *Herrera* was not entitled to habeas relief because he did not seek excusal of a procedural error; rather, he argued that newly discovered evidence showed that his conviction was factually incorrect. *Id.* at 404-05. However, the *Herrera* Court left open the possibility of a freestanding claim of actual innocence (particularly in the capital context):

> We may assume, for the sake of argument in deciding this case, that *in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.* But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be *extraordinarily high*.

*Id.* at 417 (emphasis added). Ultimately, the petitioner did not make a sufficient showing of innocence because the affidavits he submitted raised credibility issues more appropriate for a jury. *Id.* at 418-19.[16]

---

[16] In *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court held that the petitioner had stated a *Schlup* gateway claim because the central forensic proof connecting him to the

Our Court has issued two opinions that have addressed discredited expert testimony, particularly regarding fire science, as a means of proving actual innocence. Neither support Wright's actual innocence claim. *See Han Tak Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012); *Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007). In *Albrecht*, we concluded that the petitioner could not succeed on either a *Schlup* gateway claim or a *Herrera* actual innocence claim.[17] Like the new expert evidence presented here, there was some similarity to the testimony of another defense expert that was argued to the jury. Furthermore, the new expert's opinion was indecisive because he could not rule out that the fire had been intentionally set. *Id.* at 125. In *Han Tak Lee*, we remanded the petitioner's case so he could engage in discovery on his due process claim—that his conviction was predicated on what new scientific evidence has proven to be fundamentally unreliable expert testimony. *Id.* at 402, 404-05. We did not address Lee's alternative actual innocence argument: "Lee's allegations, if proven, would be sufficient to establish a *due process violation*. Therefore, we need not decide whether Lee's allegations meet the 'extraordinarily high' threshold for granting federal habeas relief based on a freestanding claim of actual innocence." *Id.* at 403 n.5 (emphasis added)

---

crime had been called into question, and he had put forward evidence pointing to a different suspect. *Id.* at 554. The Supreme Court declined to decide whether the petitioner's freestanding innocence claims were cognizable but concluded that "*Herrera* requires more convincing proof of innocence than *Schlup*," a standard the petitioner could not meet. *Id.* at 555.

[17] Albrecht asserted that the unreliable expert testimony would have constitutional significance if it resulted in a fundamentally unfair trial. We discounted this argument because the fire science *was* reliable at the time of trial. *Id.* at 122 n.6.

(citing *Herrera*, 506 U.S. at 417). The result in *Han Tak Lee* is distinguishable because Lee's claims were based on a due process violation, *not* a claim of actual innocence.

## C.       Merits of Actual Innocence Claim

We conclude that, even if a freestanding claim of actual innocence is cognizable, the merits of Wright's actual innocence claim do not satisfy the *Schlup* gateway standard, much less the "extraordinarily high" standard required by *Herrera*. We agree with the District Court that Plunkett's report and testimony are not persuasive evidence of actual innocence because they do not show a paradigm shift in understanding shaken baby syndrome that undermines the medical evidence presented at trial.

At the time of Wright's trial in July 1998, it was widely understood that shaking alone could cause the injuries Donovan presented. However, this understanding was questionable by the end of 1998. *See* Mark Donohoe, *Evidence-Based Medicine and Shaken Baby Syndrome, Part I: Literature Review, 1966-1998*, 24 Am. J. Forensic Med. & Pathology 239, 241 (2003). By 2007, Wright argues, it was widely accepted that injuries by shaking would not result in the brain injuries Donovan exhibited.[18]

Wright uses Plunkett's expert report to demonstrate how, under these new medical understandings, he could not be convicted on the basis that Donovan died as a result of shaken baby syndrome caused by trauma sustained on May 12, 1996. However, Plunkett has conceded that his opinions are not universally accepted by the scientific community. As a pathologist, Plunkett lacks the expertise to give an opinion on behalf of

---

[18] Wright relies on several recent decisions where courts have also deemed shaken baby syndrome evidence to be unsupportable. *See, e.g.*, *Del Prete v. Thompson,* 10 F. Supp. 3d 907, 957 n.10 (N.D. Ill. 2014); *State v. Edmunds*, 746 N.W.2d 590, 596 (Wis. 2008).

the entire medical community, as recognized by the PCRA court. Plunkett has also been criticized as being biased against findings of child abuse. *See* Robert M. Reece, *The evidence base for shaken baby syndrome: Response to editorial from 106 doctors*, 328 BMJ 1316, 1316 (2004).

Wright argues that Donovan's injuries can be explained as having occurred *before* May 12, demonstrating his innocence.[19] Plunkett's report argues that Donovan's brain injury occurred weeks or months prior to May 12, as demonstrated by Donovan's lethargy and decreased eating beginning on May 10. With respect to the new or fresh blood found on Donovan's brain, Plunkett argues that new medical findings show that the fresh blood need not be a result of recent trauma. However, this does not exonerate Wright. Although recent trauma may not be the *sole* explanation for the brain bleeding, it remains a possible cause. Furthermore, the jury was already presented with the theory that the medical evidence did not support an injury on May 12 from Adams and Leestma; both experts testified that Donovan's bleeding on the brain could have causes other than a new injury, such as a re-bleed either of older injuries or caused by minimal new trauma. Therefore, this evidence has less probative value as to Wright's innocence.

Wright also challenges the conclusions of ophthalmologist McManaway that Donovan's macular detachment was the result of such vigorous force that a child could be expected to have "immediate neurologic abnormalities and rapid loss of

---

[19] Wright also makes the argument that the times provided by the experts overlap with periods during which others were caring for Donovan, such as Wright's mother and Wanda Rill. This argument, however, does not demonstrate that Wright was convicted based on unreliable expert testimony.

12

consciousness" within ten minutes to an hour. (A501.) Plunkett now asserts that macular detachment can occur spontaneously or from causes other than shaking, due to intracranial pressure, and that a lucid interval occurs in a fatal head injury. (A1100.) Although McManaway's and Plunkett's conclusions as to the timing of Donovan's injuries contradict each other, no evidence *disproves* McManaway's conclusions, and the jury has already considered Plunkett's conclusion, through Leestma's testimony, that macular detachment can have causes other than shaking.

Wright's expert testimony has not persuasively shown that he is actually innocent of the death of his son. This case is not like *Han Tak Lee*, where new developments in fire science have refuted many of the older scientific theories underlying arson investigation. Instead, Wright has presented evidence why the jury should have believed his trial experts, rather than the government's. There is no evidence that the government's experts would agree with Plunkett or otherwise change their testimony from 1998. We cannot conclude that Wright is actually innocent where two differing, but supported, medical opinions exist as to the cause and timing of Donovan's death. Accordingly, we will affirm the denial of Wright's habeas petition.