[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-14173

_____

D. C. Docket No. 06-01330-CV-EAK-MAP

DERRICK TYRONE SMITH,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF THE STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 30, 2009)

Before DUBINA, Chief Judge, CARNES and HULL, Circuit Judges.

CARNES, Circuit Judge:

During an aborted robbery attempt cab driver Jeffrey Songer was shot in the back and died in the street in St. Petersburg, Florida. It happened after midnight on March 21, 1983. Eight months later Derrick Tyrone Smith was convicted for Songer's murder and sentenced to death. The Florida Supreme Court reversed that conviction and ordered a new trial because of two constitutional violations in the first trial. Smith v. State, 492 So. 2d 1063, 1067 (Fla. 1986); see Smith v. State, 641 So. 2d 1319, 1320 n.1 (Fla. 1994) ("This Court reversed Smith's conviction and sentence at his initial trial because (1) the State elicited an improper comment on Smith's exercise of his right to remain silent and (2) the trial court admitted a statement Smith made to a detective after exercising his right to remain silent.").

Smith was again convicted and sentenced to death in May 1990. The Florida courts affirmed his second conviction and sentence on direct appeal. Smith v. State, 641 So. 2d at 1323, cert. denied, 513 U.S. 1163, 115 S. Ct. 1129 (1995). Smith moved for post-conviction relief under Florida Rule of Criminal Procedure 3.850, raising twenty-seven claims against his conviction and sentence. The trial court eventually denied relief, and the Florida Supreme Court affirmed. Smith v. State, 931 So. 2d 790 (Fla. 2006). Smith then filed a petition for a writ of habeas corpus in federal district court, but the court rejected his claims. Smith v.

2

Sec'y, Dep't of Corr., No. 8:06-cv-01330-T-17MAP, 2007 WL 2302207, at *32–33 (M.D. Fla. Aug. 8, 2007).

This is Smith's appeal from that denial of federal habeas relief. It brings us a car load of issues arising from three Giglio claims (discussed in Parts III and IV of this opinion), twelve Brady claims (Parts III, V, and VI), and three Strickland claims (Part VII). After working our way through all eighteen claims, our conclusion (Part VIII) is that the district court's denial of relief is due to be affirmed for twelve of them but six of the Brady claims need more work at the materiality stage, work that is to be done by the district court on remand.

**I.**

At the 1990 trial, the State argued that Smith and his codefendant Derrick Johnson had planned to rob a taxi driver. The State's evidence indicated that shortly after midnight on March 21, 1983, one of them called the Yellow Cab company from the local Hogley Wogley BBQ. Fingerprint evidence connected Smith to the phone at the Hogley Wogley. David McGruder, the cook on duty, described seeing two men who looked like Johnson and Smith loitering outside. McGruder also testified that he saw Smith use the phone and that when the cab arrived, Smith got into the back seat and Johnson into the front. On cross-

examination, however, McGruder became confused and admitted that he was not sure whether he actually saw Smith.

To explain how Smith acquired a gun, the State presented the 1983 testimony of his uncle, Roy Cone, who had died before the 1990 trial. Cone had testified that he purchased a blued revolver and a single box of bullets in 1972. Cone kept the gun under his mattress for many years. He saw it there in January of 1983, but it was gone two months later. He did not know what happened to it. Smith did not live at Cone's house during that time, but he did visit.

To establish that Smith was the triggerman, the State presented the testimony of Ernest Rouse, Carolyn Mathis, Priscilla Walker, and James Matthews. All of them testified that they had seen Smith with a revolver on the night of the murder. Carolyn Mathis' sister Regina also testified that Smith had told her he was planning to "hustle" some money that night. Matthews had heard Smith say a similar thing. Rouse, who knew Johnson, said that Smith and Johnson were together on the night of the murder, and both Mathis sisters saw a man matching Johnson's description with Smith. No one saw Johnson with a gun.

The State also presented eyewitness testimony from Melvin Jones, who lived near the crime scene. Jones said that on the night of the murder he had been walking home, watching for police cars because he had outstanding warrants,

4

when he saw the cab arrive. He recognized Smith and Johnson "from the street" but testified that he had never talked to either of them. Jones saw Smith get out of the cab's back seat and Johnson get out of the front seat. Smith had a gun, and when the cab driver ran Jones saw Smith shoot him. After witnessing the shooting Jones hurried home, where he eventually told his wife, Mellow Jones, what he had seen. She testified that Jones had told her that night that he had seen a man get shot.

After first denying it, Jones acknowledged that had he had made a deal with the State involving his 1983 testimony. The deal gave him leniency for the seventeen unrelated felony charges that Jones had been facing at the time of Smith's first trial. Jones was never asked whether he had received any new promise or benefit from the State in 1990 for his second (current) round of testimony.

For his part, Smith's codefendant Derrick Johnson pleaded guilty to second degree murder and testified for the State. Johnson told the jury that he and Smith had agreed to rob a cab and had gone to the Hogley Wogley, where Smith had called the cab company. Johnson described Smith's gun as a black revolver with a brown handle, which was consistent with Cone's gun.. Johnson said that Smith had sat in the rear of the cab. The driver had seen the gun and tried to run away

5

but Smith fired at him. Johnson and Smith then ran off and separated. On cross-examination, it became clear that Johnson had lied to police initially about the crime, but he stated again that there had never been a plan to shoot anyone. Johnson admitted to one felony conviction but was never questioned about his plea deal with the State.[1]

To recount what happened after the crime, the State presented Priscilla Walker and James Matthews, who were living together at the time of the murder. They both said that Smith had come to their home that night. Walker testified that Smith had told her that he "shot a cracker in the back." The victim, Jeffrey Songer, was white. Matthews testified that Smith had said that he "might have shot someone." The State also presented Marcel DeBulle, a Canadian tourist who described how Smith had robbed him in the early afternoon of March 21, about twelve hours after the murder. DeBulle testified that Smith had carried a black or blue revolver, had entered DeBulle's hotel room, and had handled his briefcase. Fingerprints from the briefcase were matched to Smith. Smith was convicted of that robbery and is serving a life sentence for it.

---

[1] The defense agreed not to cross-examine Johnson about his plea deal in return for the State not producing evidence that, the morning after the murder, Johnson had told several women that he had been involved in a shooting and that it was Smith who had fired the fatal shot.

The State also presented physical evidence and expert testimony linking Smith to the murder. FBI Agent Robert Sibert testified that Smith's jeans pocket contained lead residue consistent with bullets. The State put into evidence a bullet fragment taken from Songer's clothing. Two other FBI agents, Asbery and Havekost, were qualified as experts and testified that the bullet fragment, according to lead compositional analysis, "matched" bullets from the ammunition box Roy Cone had purchased in 1972 and still possessed at the time of the murder. The State used this evidence to argue that it was Smith who had stolen his uncle's gun and some bullets that had come from the box—bullets that were used to kill the victim. The gun itself was never found.

The only witness for the defense was Larry Martin, a prisoner who had been incarcerated with Johnson. Martin testified that Johnson told him that Smith was not the shooter, but he also conceded that Johnson did not say who was or what Johnson's own role had been. On cross-examination, the State brought out that Martin had eight felony convictions.

In its closing argument the State stressed the consistencies in the testimony given by its witnesses. It pointed out the number of witnesses who had seen Smith with a gun on the night of the murder and the fact that none had seen Johnson with one. The State emphasized that both Johnson and Jones had actually seen Smith

shoot Songer. Referring to its bullet lead analysis, the State argued that it had proven the bullet that killed Songer and those in the box at Smith's uncle's house were "materially indistinguishable. They're the same." The chance of that compositional similarity occurring coincidentally "boggles the mind." The State pointed out that in order to find Smith not guilty the jury would have to believe Larry Martin and disbelieve all of the State's witnesses.

The defense's closing argument focused on reasonable doubt. Smith's counsel conceded that it "look[ed] very suspicious" for Smith, but argued the State's circumstantial evidence failed to show who shot Songer. Counsel stressed that the only two eyewitnesses against his client, Johnson and Jones, each had much to gain from the State. He argued that Johnson's only goal was to pin the murder on Smith and that Melvin Jones either was lying to save himself from unrelated charges or was involved in the murder himself.

In its rebuttal argument the State argued the idea of Jones and Johnson cooking up the story to frame Smith was "ludicrous" because Jones and Johnson did not even know each other at the time of the crime. The State also reiterated that the fingerprint evidence connected Smith to the phone used to call the cab, and reminded the jury that the bullet fragment found on Songer "match[ed]" the

bullets from Smith's uncle's house.  After an hour-and-a-half of deliberation, the jury found Smith guilty.

## II.

When reviewing state court judgments in post-conviction proceedings, federal courts are constrained by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254.  Under AEDPA, we cannot grant federal habeas relief unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); LeCroy v. Sec'y, Dep't of Corr., 421 F.3d 1237, 1259 (11th Cir. 2005).  We review de novo the district court's decision about whether the state court acted contrary to clearly established federal law, unreasonably applied federal law, or made an unreasonable determination of fact. Hall v. Head, 310 F.3d 683, 690 (11th Cir. 2002).

A state court's decision is "contrary to" clearly established federal law if it and Supreme Court precedent are "diametrically different . . . opposite . . . [or] mutually opposed." Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000).  Put a little differently, a state court acts contrary to clearly established

9

federal law if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Id. at 406, 120 S. Ct. at 1519–20.

Similarly, "[a] state court's decision amounts to an 'unreasonable application' of federal law if it identifies the correct legal rule from Supreme Court case law, but applies that rule in an unreasonable manner to the facts of petitioner's case." Breedlove v. Moore, 279 F.3d 952, 961 (11th Cir. 2002). An unreasonable application of federal law is not simply an erroneous or incorrect application; it must be objectively unreasonable. Id.; Williams, 529 U.S. at 409, 120 S. Ct. at 1521. In order to merit AEDPA deference the state court need not expressly identify the relevant Supreme Court precedent, nor make a perfect statement of the applicable rule of law, nor provide a detailed opinion covering each aspect of the petitioner's argument. Parker v. Sec'y, Dep't of Corr., 331 F.3d 764, 776 (11th Cir. 2003); Wright v. Sec'y, Dep't of Corr., 278 F.3d 1245, 1254 (11th Cir. 2002).

State courts' factual findings are also due great deference. "A determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by

10

clear and convincing evidence." 28 U.S.C. § 2254(e)(1); LeCroy, 421 F.3d at 1259.

## III.

In Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." The Court later clarified that a defendant need not request favorable evidence from the State to be entitled to it. United States v. Agurs, 427 U.S. 97, 103–07, 96 S. Ct. 2392, 2397–99 (1976).

There are two categories of Brady violations, each with its own standard for determining whether the undisclosed evidence is material and merits a new trial. Id. The first category of violations, often called (and what we will call) Giglio claims, occurs where the undisclosed evidence reveals that the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false. Agurs, 427 U.S. at 103–04, 97 S. Ct. at 2397–98; Giglio v. United States, 405 U.S. 150, 153, 92 S. Ct. 763, 766 (1972) (noting that the same rule applies when "the State, although not soliciting false evidence, allows it to go uncorrected when it appears.") (internal quotation marks omitted); United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (the Giglio

11

rule applies to "explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury" while questioning a witness).  Under this category of Brady violations the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Agurs, 427 U.S. at 103; 97 S. Ct. at 2397.  The "could have" standard requires a new trial unless the prosecution persuades the court that the false testimony was "harmless beyond a reasonable doubt."  Ford v. Hall, 546 F.3d 1326, 1332 (11th Cir. 2008) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)).  This standard favors granting relief.  It is shaped by the realization that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."  Giglio, 405 U.S. at 153, 92 S. Ct. at 766 (internal quotation marks omitted).

The other category of Brady violations occurs when the government suppresses evidence that is favorable to the defense, although the evidence does not involve false testimony or false statements by the prosecution.  The defendant is entitled to a new trial if he establishes that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682, 685, 105

S. Ct. 3375, 3383, 3385 (1985) (internal quotation marks omitted); see also Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565 (1995). A "reasonable probability" of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. See Kyles, 514 U.S. at 434, 436–37 n.10, 115 S. Ct. at 1566, 1567 n.10.

With both types of Brady claims, "[w]e evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately." Id. at 436–37 n.10, 115 S. Ct. at 1567 n.10; Maharaj v. Sec'y, Dep't of Corr., 432 F.3d 1292, 1310 (11th Cir. 2005) (explaining that the "appropriate methodology [involves] considering each Brady item individually, and only then making a determination about the cumulative impact"). Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at the trial. That is the way a court decides if its confidence in the guilty verdict is undermined where a suppressed-evidence type of Brady claim is involved, or if the suppression was harmless beyond a reasonable doubt where a Giglio type of Brady claim is involved.

## IV.

We begin by addressing Smith's Giglio claims.  "To prevail on a Giglio claim, a petitioner must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material." Ford, 546 F.3d at 1331–32 (internal quotation marks omitted).  In at least some circumstances, prosecutorial statements may be treated the same as testimony for this purpose.  See Alzate, 47 F.3d at 1110.  Smith raises three Giglio claims.

### A.

Smith claims that prosecutor Glenn Martin lied to the jury in his rebuttal closing argument during Smith's 1990 trial.  Martin said:

> One thing [the defense] was trying to say is that somehow Derrick Johnson and Melvin Jones, the guy hiding behind the bushes, plotted and planned this together.  Well, first of all, they didn't even know each other.  Derrick Johnson didn't know who Melvin Jones was.  Melvin Jones heard of, by nickname, by street name, Derrick Johnson. . . . To follow the argument put forth by [the defense] you would have to believe that . . . [the] two of them were in league from the very beginning, which is totally ludicrous."

Smith asserts that this statement was false because Martin knew at the time he made it that Jones and Johnson had met.  It is undisputed, however, that Jones and Johnson met in jail after the murder and had never spoken before that time.  The prosecutor's statements were appropriate in light of the defense's contention that

14

Jones and Johnson had colluded on or before the date of the crime. They were also accurate. Accurate statements do not violate the Giglio rule.

**B.**

Smith claims that before and during his 1983 trial Jones and Johnson gave false testimony denying that they had ever been incarcerated together. Smith asserts that at the time these lies occurred, in a deposition in late September 1983 and again at trial in November of that year, prosecutor Tom Hogan knew that the two men had met in jail. A memo that Hogan wrote to himself on September 12, 1983 shows Hogan knew the two had met. However, he failed to correct their false testimony denying any meeting. Any effect that Hogan's failure to correct that testimony may have had on the 1983 conviction was mooted when the Florida Supreme Court reversed it.

Seeking to salvage the claim, Smith contends that the 1990 trial was affected because the prosecutors failed to reveal that Jones and Johnson had lied in the earlier trial. But for the lies at the 1983 trial, Smith argues, his defense attorneys would have discovered and brought out at the 1990 trial the fact that Jones and Johnson had met in jail. Notably, Smith does not suggest that either Jones or Johnson lied at the 1990 trial. Instead, he argues that their false

15

testimony in 1983 caused his attorneys not to cross-examine Jones or Johnson in 1990 about their earlier meeting.

Smith raised this claim during both his state Rule 3.850 proceeding and in his petition for federal habeas. At the state-court Rule 3.850 evidentiary hearing, Smith's attorney from the 1990 trial confirmed that he had possessed the transcript of the 1983 cross examination of Johnson.[2] He also testified that if he had known that Jones and Johnson had talked before the 1983 trial, he would have used that fact.

The Florida Supreme Court found this Giglio claim unsubstantiated because Smith "failed to show that any of the retrial [1990] testimony was false and that the State failed to correct it." Smith, 931 So. 2d at 799–800. We must decide whether, under 28 U.S.C. § 2254(d), that conclusion is a reasonable application of clearly established federal law, as defined by the United States Supreme Court. It

---

[2] Q. [D]id you have the record on appeal from the first case when you were preparing this case?
A. Yes.
Q. Is that something— that page of the record [page 1536] something that you would have had in evaluating your case?
A. Yes.
. . .
Q. And does that indicate that Derrick Johnson indicated he never had a discussion with Melvin Jones about this case?
A. Yes. It says have you ever discussed this case at all with Melvin Jones, and he says no, I never have. [Tr. 5005–5007].

is.  Smith does not cite to any Supreme Court decision that applies <u>Giglio</u> to lies or misstatements made in earlier trials of the same case, and we cannot find one.  Therefore, even if we might ourselves decide to extend <u>Giglio</u> to cover false testimony at an earlier trial that may have affected a retrial, our decision would not apply to this case.  <u>See</u> 28 U.S.C. § 2254(d)(1) (referring to "federal law as determined by the Supreme Court of the United States");  <u>Williams v. Taylor</u>, 529 U.S. 362, 381, 120 S. Ct. 1495, 1506–07 (2000) (explaining that under § 2254(d)(1) court of appeals decisions do not count as "clearly establishing [federal] law"); <u>Anderson v. Sec'y, Dep't of Corr.</u>, 462 F.3d 1319, 1327 (11th Cir. 2006) ("The requirements of § 2254(d)(1), codifying <u>Teague v. Lane</u> . . . and respect for the finality of state criminal judgments preclude us from creating new constitutional rules of criminal procedure on collateral review."); <u>see also</u> <u>Schwab v. Crosby</u>, 451 F.3d 1308, 1323 (11th Cir. 2006) (explaining the relationship of § 2254(d)(1) to the <u>Teague</u> non-retroactivity doctrine).

In <u>Anderson</u> we noted that although the <u>Brady</u> principles might support it, the Supreme Court had never expressly extended <u>Brady</u> to false testimony before the grand jury.  462 F.3d at 1326–27.  Accordingly, we concluded that the Florida Supreme Court's decision to deny relief was not unreasonable in a case where lies were told to the grand jury.  <u>Id.</u> at 1327–28.  The same applies to false testimony

17

given in earlier trials. The Supreme Court has never extended <u>Giglio</u> to that situation and we cannot say that the Florida Supreme Court's decision not to do so is unreasonable.

**C.**

Smith claims that the State allowed Melvin Jones to lie at the 1990 trial about what the State had given him in exchange for his testimony at the 1983 trial. During the 1990 trial, Jones testified that when he first came forward to tell the police what he saw on March 21, 1983, he had been facing "seventeen or eighteen" felony charges. Then came this cross-examination:

Q. Did you ever do time on all those felony charges?

A. Yes, I had.

Q. How much time did you get?

A. I did three years on it.

Q. Total three years?

A. Yes.

It would have been more accurate for Jones to say that in December 1983 he had received a three-year suspended sentence plus two years of probation, but he ended up serving the three-year sentence anyway.[3] The reason is that in 1985 he

---

[3] Precisely how long Jones was actually behind bars on the three-year sentence is unclear. The defense counsel asked him, but the prosecution objected. After a bench conference, the judge ruled that the question would be allowed, but the defense counsel moved on without re-asking it.

ran afoul of the law again (which is hardly surprising given the number of felony charges he had been facing when he came forward in connection with this case). Smith argues that Jones should have testified to those details.

The Florida trial court that ruled on Smith's Rule 3.850 motion decided that this claim was insufficiently pleaded. Florida v. Smith, 83-02653 at 8–9 (Fla. Cir. Ct. Jan. 3, 2002) ("Defendant did not sufficiently allege what was false about Mr. Jones' testimony regarding the deal he got for testifying against Defendant."). Smith's 205-page amended pleading seeking relief from the state court did not mention Jones' testimony about his deal with the State or about the length of time he was sentenced to or had served. The Florida Supreme Court agreed that this claim had been insufficiently raised at the trial court level. Smith, 931 So. 2d at 800 ("First, as the circuit court correctly found, the claim was insufficiently pled."). The federal district court found no reason to disturb the state procedural bar. Smith, 2007 WL 2302207, at *11. The State has consistently pressed its procedural bar defense to this claim.

Ordinarily a state procedural bar is honored in federal habeas. Coleman v. Thompson, 501 U.S. 722, 729–30, 111 S. Ct. 2546, 2554 (1991) ("The [adequate and independent state ground] doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had

19

failed to meet a state procedural requirement."). There are two ways that a procedural bar may be lifted. See Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008). First, defaulted claims can be reviewed if the petitioner shows adequate cause excusing the default and actual prejudice arising from it. See Dretke v. Haley, 541 U.S. 386, 392– 93, 124 S. Ct. 1847, 1852 (2004). Second, a petitioner can avoid a state procedural bar if he establishes that application of the bar would cause "a fundamental miscarriage of justice." McCleskey v. Zant, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470 (1991). Smith does not contend that he has established either the "cause and prejudice" or the "fundamental miscarriage of justice" exception. Accordingly, federal habeas review of this claim is barred. See Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1353 (11th Cir. 2005) ( a petitioner's failure to  address a procedural bar holding waives any argument against it).

In summary, we reject all of Smith's Giglio claims. It follows that there is no need to conduct a materiality inquiry for any of the allegedly false testimony. The same cannot be said for all of the Brady claims.

## V.

Smith brings us twelve distinct Brady claims. Our organizational plan is to first address those that fail to reach the materiality stage either because they are

20

procedurally barred or because they fail on the suppression element. See Strickler

v. Greene, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999) (noting that Brady

violations require the evidence to have been suppressed by the State, be favorable

to the defense, and be cumulatively material).  Then we will address the Brady

claims that make it to the materiality analysis.

**A.**

There are six Brady claims that are procedurally barred or are based on

evidence that was not actually suppressed.

**1.**

Smith claims that the State failed to disclose impeachment information

about Mellow and Melvin Jones.  Two police reports indicate that the Jones'

house was canvassed by officers twice on the night of the murder, once at 1:00

a.m. and again around 8:30 a.m.  He characterizes the first report as indicating

that a black male named  "Melow" Jones answered the door at 1:00 a.m. but had

not seen or heard anything.[4]  He characterizes the second report as indicating that

---

[4]  Actually, what the first report states is that, "The following neighborhood was then done by this writer," which is followed by a list of names and addresses, most of which have after them the word  "NEGATIVE."  One of those names and addresses is that of "Melow Jones," and it is followed by the word "NEGATIVE."

Mellow Jones, this time identified as a black female, answered the door around 8:30 a.m. but had no information about the incident.[5]

Smith argues that the second police report, which allegedly was not disclosed, could have been used to impeach Melvin and Mellow Jones. According to Smith, at trial the prosecution used Mellow Jones to confirm that her husband Melvin actually had seen the shooting. It buttressed her credibility by suggesting that at the time of the first neighborhood canvass Mellow had not yet heard her husband's story, which explained why she did not pass it on to the police at 1:00 a.m. That explanation would not apply to her failure to do so when questioned at 8:30 a.m.

Smith also argues that an undisclosed 1988 interview of Mellow Jones was impeachment evidence because it contradicted her 1983 statements. The police report from the second canvass and Mellow Jones' 1988 interview, therefore, might have been useful against the Joneses.

The Florida Supreme Court held that both of these Mellow Jones <u>Brady</u> claims were procedurally barred because they were not raised during the collateral proceedings in the Florida trial court. <u>Smith</u>, 931 So. 2d at 798. ("[T]his claim

---

[5] Actually, what the second report states is that, "On 3/21/83, at approximately 0830 hours writer conducted a neighborhood of the following locations with negative results." One of the ten listed names and addresses is that of "Mellow Jones."

was not raised below and thus is not preserved for our review."). Under Coleman, that is an adequate and independent state ground for decision, meaning that federal courts must honor it unless one of the exceptions apply. See 501 U.S. at 729–30, 111 S. Ct. at 2554.

Smith does not contend that he can show adequate cause for his default and actual prejudice from it, nor does he argue that his case involves a fundamental miscarriage of justice. See Mize, 532 F.3d at 1190 (identifying the two routes around a state procedural bar). Instead, Smith's briefs ignore the Florida Supreme Court's ruling and reiterate his argument on the merits of the claims. The Florida Supreme Court's ruling stands. Herring, 397 F.3d at 1353 (failure to address a procedural bar in the initial brief to this Court waives any argument against it).[6] The Brady claims involving the reports from the neighborhood canvasses and

---

[6] At oral argument we asked Smith's counsel to respond to the Florida Supreme Court's procedural bar holding. He cited Way v. State, 760 So. 2d 903, 915 (Fla. 2000), for the proposition that addressing an issue in a closing argument— as Smith did before the state trial court during the collateral proceeding— sufficiently raises the issue under Florida law. However, the Way decision did not hold that. Way held that the failure of an attorney to tell the trial court during his argument that he wanted certain claims addressed cumulatively waived the argument that they should have been. Id. That does not mean bringing up a claim for the first time during argument will un-do a waiver that occurred when a claim was omitted from the pleadings and briefs. We know from the Florida Supreme Court's specific ruling in this case that the belated argument of the claim did not cure the earlier waiver.

In any event, Smith's oral argument comes too late. McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1262–63 (11th Cir. 2004) ("A party is not allowed to raise at oral argument a new issue for review."); see also Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1256 n.6 (11th Cir. 2005) (an argument raised for the first time during oral argument comes too late).

23

Mellow Jones' 1988 interview do not make it to the materiality analysis and the evidence will not be considered in Smith's favor at that stage.

**2.**

Smith claims that the State failed to disclose a report showing that Derrick Johnson had failed a 1983 polygraph examination about the crime and that he made a statement during it that would have been useful to the defense. During the examination Johnson explained that he had initially lied to police about being with Smith on the night of the murder because he was afraid of implicating himself. Smith argues that statement should have been disclosed because it showed he had a motive to lie and had been willing to do so to minimize his own culpability.

The Florida Supreme Court found that because this argument was not made in Smith's post-conviction motion to the state trial court, "[that] court did not address it, and it is not preserved." Smith, 931 So. 2d at 799 n.5; see also Coleman, 501 U.S. at 729–30, 111 S. Ct. at 2554. Again, Smith ignores the Florida Supreme Court's ruling on this issue and makes no argument for avoiding procedural bar based on the "cause and prejudice" test or the "fundamental miscarriage of justice" line of cases. See Mize, 532 F.3d at 1190; Herring, 397 F.3d at 1353. Again, the Florida Supreme Court's procedural bar ruling stands. The Brady claim about the polygraph examination and Derrick Johnson's

24

statement during it does not make it to the materiality analysis, and the evidence will not be considered in Smith's favor at that stage.

**3.**

Smith claims that the State suppressed evidence that could have been used to impeach Priscilla Walker. She testified at the 1990 trial that she had seen Smith at her house during the evening shortly before the murder and that while Smith was there, her boyfriend James Matthews showed her Smith's gun. Walker also testified that Smith returned to her house between midnight and 1:00 a.m.— the shooting occurred around 12:45 a.m.— and told her that he had "shot a cracker in the back" because the victim, a cab driver, had not wanted to give up his money. On cross examination, Walker stated that she did not know Smith very well and she denied disliking him.

Smith asserts that at the time of the retrial in 1990 Priscilla Walker had criminal welfare fraud charges pending against her under an alias and that she had already been charged with obstruction of justice and three probation violations between 1988 and 1990. He also asserts that Walker's bond was reduced after she testified against him in 1990 and that she later received probation. None of that evidence was disclosed to Smith.

25

The State contends that any claims about nondisclosures relating to Priscilla Walker are procedurally barred because Smith did not even mention her in his initial brief to the Florida Supreme Court during his appeal from the denial of collateral relief. The Florida Supreme Court did not mention any <u>Brady</u> issue involving Priscilla Walker in its opinion. <u>See</u> <u>Smith</u>, 931 So. 2d 790. The State argues that under Florida law, the fact that Smith talked about Priscilla Walker in his reply brief to the Florida Supreme Court is not enough to avoid waiver. <u>Gen. Mortgage Assocs., Inc. v. Campolo Mortgage & Realty Corp.</u>, 678 So. 2d 431, 431 (Fla. 3d DCA 1996) ("The fact that this issue was raised for the first time in the reply brief alone precludes our consideration of the matter.").

In response, Smith argues that the State should not be allowed to sandbag him by raising the procedural default defense for the first time on appeal, although he does not suggest that he could have responded any differently had he faced it in the district court. Smith does not deny that he failed to even mention Priscilla Walker in his initial brief to the Florida Supreme Court, nor does he contend that he can escape the procedural bar through a showing of cause and prejudice or a fundamental miscarriage of justice. Instead, Smith's only argument is that the State has waived its procedural bar defense as to this claim by not asserting it in the district court.

26

After the enactment of AEDPA, whether the State's failure to raise a procedural bar defense waives it depends on the basis of the defense. If the procedural bar defense arises from the petitioner's failure to raise the claim at all and thereby exhaust state remedies, that defense cannot be waived implicitly by the State's failure to assert it. 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement."); McNair v. Campbell, 416 F.3d 1291, 1306 (11th Cir. 2005). If, on the other hand, the petitioner did raise the claim in the state courts but not at the time or in the manner required by state procedural rules, the resulting procedural bar defense may be waived by the State's failure to assert it. See McNair, 416 F.3d at 1306 (a procedural bar that arises from the failure to bring a claim in state court "is to be distinguished from one that arises, not because of a failure to exhaust, but rather because the state court will not hear the claim due to a state procedural bar"); see also § 2254(b)(3) (by implication). Unfortunately for Smith, this procedural bar defense arises from his failure to raise this particular Brady claim in the state courts.

Not only did Smith fail to raise this Brady claim in the state trial court during the collateral proceeding, he did not even mention Walker's name in his initial brief to the Florida Supreme Court. His reply brief in that court did talk

27

about Walker, but not in the argument section. Instead, Smith mentioned her in a section titled "Reply to Appellee's Statement of the Case and Facts." In that section, he complained that "left out of the State's brief is the full Priscilla Walker story." He then told his version of the Walker story and while doing so said that the trial court, during the hearing on his motion for collateral relief, had refused to permit him to introduce Brady evidence regarding Walker. But the Brady evidence relating to Priscilla Walker was not the evidence this claim is based on. He did not argue to the Florida Supreme Court that Walker had charges pending against her when she testified at the 1990 trial, nor did he argue that she had derived a benefit from the State in return for her testimony. He never said anything at all about that alleged evidence.[7]

The long and short of it is that Smith never presented to the state courts any claim for relief involving this allegedly withheld evidence about Priscilla Walker. None at all. In other words, Smith did not lose an opportunity to have this Brady claim decided in state court because he raised it in an untimely or procedurally defective way, as by asserting it in his reply brief instead of his initial brief. See McNair, 416 F.3d at 1306. Instead, Smith lost the opportunity to have the state

---

[7] The Priscilla Walker Brady claim that Smith did raise in his reply brief is discussed later in this opinion. See infra page 44.

courts decide this claim because he never raised it as a claim anywhere in the state courts. He never gave the state courts an opportunity to rule on this claim, even belatedly. He thereby failed to exhaust his state remedies within the meaning of §2254(b)(3). Cf. id. (observing that because the federal issues mixed into petitioner's state law claims were needles in a haystack that did not invite the state court to rule on them, there was a failure to exhaust type of procedural bar).

It follows that the fact the State did not raise in the district court Smith's failure to raise this Brady claim in the state courts does not waive the defense. Id. at 1305 (holding that the State's failure to point out to the district court the petitioner's omissions in state court did not waive its procedural bar argument at the court of appeals); see also Gonzales v. McKune, 279 F.3d 922, 924 (10th Cir. 2002) (en banc) (applying a procedural bar arising from the petitioner's failure to exhaust his federal claim in the state courts even though the State did not assert that defense until en banc oral argument).

Because the procedural bar defense is not waived and the factual basis for it is not in dispute, the only way Smith might avoid the bar is either through the cause and prejudice or the fundamental miscarriage of justice exception. Mize, 532 F.3d at 1190. He does not argue either one. Accordingly Smith's Brady claims based on the undisclosed evidence about Walker's incentives to testify for

29

the State do not make it to the materiality analysis, and the evidence will not be considered in Smith's favor at that stage.

**4.**

Smith claims that the State failed to disclose a police report indicating that Melvin Jones had taken a polygraph examination in 1983, supposedly because the police doubted his version of events at the murder scene. Smith says that if his defense counsel had known about that examination, it might have led to useful impeachment evidence even though the examination result was not admissible under Florida law.

In ruling on Smith's Rule 3.850 motion, the Florida trial court noted that the State asserted that the report about Jones' polygraph examination had been disclosed to the defense. Smith did not offer then, nor has he offered since, any evidence that the report was not disclosed. The best Smith can do is point to his lawyer's statement, made in 2002, that "I don't remember whether I did [get the polygraph information] or not."

Both the Florida Supreme Court and the federal district court noted that there had been no evidence offered to support this claim. See Smith, 931 So. 2d at 799; Smith, 2007 WL 2302207, at *8. Because the claim has no factual basis, the

district court properly denied it. The allegations will not be considered in the materiality analysis.

**5.**

Smith claims that an undisclosed police report written by Officer Mike Krause, who was the first to interview Hogley Wogley cook David McGruder, indicates that McGruder told him both Smith and Johnson had entered the rear of the taxi. If that is true, it contradicts what McGruder later said to police and testified to at trial, which was that the shorter, darker-skinned man (Smith) into the back of the taxi while the taller, lighter-skinned man (Johnson) got into the front.

There was no argument in any of Smith's briefs to the Florida Supreme Court that the failure to provide Officer Krause's report to the defense violated Brady.[8] Accordingly, Smith has failed to exhaust this Brady claim. See Keeney v. Tomayo-Reyes, 504 U.S. 1, 10, 112 S. Ct. 1715, 1720 (1992) ("Exhaustion means more than notice. In requiring exhaustion of a federal claim in state court, Congress surely meant that exhaustion be serious and meaningful."). The State has

---

[8] A footnote in the facts section of Smith's initial brief stated that Officer Krause's report had not been provided to the defense. But nowhere in the brief did Smith argue that was a Brady violation. Failure to offer any argument on an issue in a brief abandons that issue. See Zivojinovich v. Barner, 525 F.3d 1059, 1062 n.1 (11th Cir. 2008); United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998).

31

never argued that this Brady claim is procedurally barred but instead has ignored the claim altogether. Under § 2254(d), however, the State cannot waive its procedural bar argument in a true failure-to-exhaust situation by ignoring the claim. See Day v. McDonough, 547 U.S. 198, 206, 126 S. Ct. 1675, 1682 (2006) ("[T]he Courts of Appeals have unanimously held that, in appropriate circumstances, courts, on their own initiative, may raise a petitioner's procedural default, i.e., a petitioner's failure properly to present an alleged constitutional error in state court, and the consequent adequacy and independence of state-law grounds for the state-court judgment."); see also Moon v. Head, 285 F.3d 1301, 1315 n.17 (11th Cir. 2002).

Because it is apparent that the Florida courts would now refuse to hear this claim, it is procedurally defaulted. Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief."). The alleged evidence it concerns will not be considered in the materiality analysis.

**6.**

Smith claims that the State failed to disclose to him the contents of the police report made after Smith was questioned in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966). It was this <u>Miranda</u> violation that led to Smith's 1983 conviction being reversed, but he argues that the State's failure to disclose the contents of the report prevented the defense from learning how the police had used his improperly obtained statements in their later investigations. Smith argues that because of the State's nondisclosure, the defense could not know whether other evidence was the fruit of the <u>Miranda</u> violation.

The district court held that this <u>Brady</u> claim was procedurally barred because Smith failed to raise it on direct appeal after his 1990 trial. <u>Smith</u>, 2007 WL 2302207 at *9 (citing <u>Atwater v. Crosby</u>, 451 F.3d 799, 810 (11th Cir. 2006) ("It is well-settled that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred ... [,] there is a procedural default for purposes of federal habeas . . . .")). Smith does

not dispute the application of the procedural bar, so it stands.[9]  The alleged

evidence this claim concerns will not be considered in the materiality analysis.

**B.**

There are six <u>Brady</u> claims that are not procedurally barred and that involve

favorable evidence that was actually suppressed.  The evidence involved in these

claims, which we are about to discuss, is due to be considered in the cumulative

materiality analysis required by <u>Kyles</u>, 514 U.S. at 434, 115 S. Ct. at 1566.

**1.**

Smith claims that the State failed to disclose evidence that Melvin Jones

talked to a prosecutor on April 19, 1989 and made statements that the defense

could have used to impeach him.  Not content with what he had received for his

testimony at the 1983 trial, Jones told the prosecutor that in exchange for

testifying again at the 1990 trial he wanted help with some probation violations

and a grand theft charge he had pending.  <u>Cf.</u> Janet Jackson, "What Have You

Done for Me Lately," on Control (A&M Records 1986).

---

[9]  We do not mean to imply, as Smith's claim assumes, that <u>Brady</u> applies outside the realm of exculpatory evidence and extends to evidence useful to the defense in a fruit-of-the-poisonous-tree quest.  He cites no authority for that proposition and we would be skeptical about concluding that, especially in a federal habeas proceeding.  <u>See</u> 28 U.S.C. § 2254(d)(1).

Smith raised this claim in the argument section of his initial brief to the Florida Supreme Court. He brought it up again in his initial brief to the district court. The State has never responded to this claim or denied that the evidence it involves should be considered at the materiality stage. It will be.

**2.**

Smith claims that the State failed to disclose an August 9, 1989 note written by the prosecutor who had represented the State at Smith's 1983 trial. The note states that Melvin Jones called the prosecutor because he was concerned that his daughter was going to accuse him of sexual abuse committed while she was a minor. Jones said the accusations were false and designed to prevent him from reuniting with his wife. He wanted the prosecutor's office to give him and his daughter polygraph examinations. Smith, 931 So. 2d at 798. Jones was worried about being arrested. In her note the prosecutor described Jones' state of mind this way: "He's afraid he'll be arrested." Smith argues that Jones' fear of arrest based on those accusations motivated him to testify at the 1990 trial and that the information in the note could have been used to show Jones was testifying again to curry favor with the State in order to help himself out of his own legal troubles.

The Florida Supreme Court held that "[t]he note does not provide exculpatory or impeachment material. The note was not relevant either to the

35

retrial or to Jones' motivation to provide testimony." Id. The United States Supreme Court has clearly held, however, that evidence that could be useful in impeaching prosecution witnesses must be disclosed under Brady. See Bagley, 473 U.S. at 676, 105 S. Ct. at 3380. And the Court has held that evidence of motivation to testify, especially for key prosecution witnesses, is impeachment evidence that must be disclosed. See Giglio, 405 U.S. at 154–55, 92 S. Ct. at 767 ("Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."); Kyles, 514 U.S. at 442 n.13, 115 S. Ct. at 1569 n.13 (evidence showing the motive for an important government witness to come forward is impeachment evidence covered by the Brady rule); Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

Melvin Jones was an important State witness. He was the only eyewitness to the crime who was not involved in the robbery and murder. Both sides recognized that his credibility was important, and the defense cross-examined him

36

intensely about his motivation to testify at the 1983 trial and about the sentencing break he got for that testimony. At the 1990 trial, however, the defense had nothing to show that Jones had a motive for testifying against Smith again since the charges he had faced in 1983 were long gone. The State failed to disclose that Jones did have a new reason to curry favor with the prosecution—that he feared he would be charged with a serious crime, that he was looking for help from the prosecutor if his fears were realized, and that he had talked with the prosecutor about it before he testified at the 1990 trial.

For these reasons, we conclude that the Florida Supreme Court's decision was unreasonable insofar as it determined that the prosecutor's 1989 note about Melvin Jones' fears that he would be facing charges that he had sexually abused his daughter was not impeachment evidence under Brady. The note could have served to impeach an important prosecution witness, and it is undisputed that the note was not disclosed. The evidence about the note is due to be considered at the materiality stage. See Kyles, 514 U.S. at 450, 115 S. Ct. at 1573 ("[I]t would have had some value as exculpation and impeachment, and it counts accordingly in determining whether . . . materiality is satisfied.").

37

**3.**

Smith claims that the State failed to disclose police reports indicating that Melvin Jones was initially listed as a suspect in the murder. The only reason Jones was a suspect is that he lived within a block of the crime scene and had outstanding warrants for his arrest. Smith, 931 So. 2d at 798. Smith argues that, although the defense knew about the facts that caused the police to suspect Jones, the additional fact that the police noted in a report that he was considered a suspect is itself exculpatory evidence. The Florida Supreme Court determined that the police report listing Jones as a suspect was not, alone, material. Smith, 931 So. 2d at 798.

The Florida Supreme Court's determination that the police report listing Melvin Jones as a suspect was not material by itself is a reasonable application of federal law. There is no evidence that Jones knew, or even believed, that he was a suspect in the Songer murder, and it is unclear how a police report that Jones was entirely unaware of could possibly have motivated him to do anything. In Kyles, however, the Supreme Court suggested that Beanie, a witness who also did not know whether he was a suspect, still might have worried about his own criminal liability. 514 U.S. at 442 n.13, 115 S. Ct. at 1569 n.13. The Court held that the fact that Beanie was considered a suspect was impeachment evidence against him.

38

Id. Importantly, in Kyles the undisclosed Brady material kept the defense from knowing the factual basis for Beanie's concern that he might be a suspect.

In this case, by contrast, the defense was well aware that Melvin Jones lived very close to the murder scene and had arrest warrants for a number of felonies. Unlike in Kyles, here the defense had all the facts it needed to assert that Jones may have come forward in part to dodge suspicion that he was the shooter. Smith's counsel argued to the jury that Jones may have been involved in the murder; as a result, we agree with the Florida Supreme Court that the additional impact of a preliminary police report listing Jones as a suspect, especially when Jones had no idea that the report existed, is not material by itself. But the report was favorable to Smith, although barely, and it was undisclosed. Therefore, the evidence of it should be considered in the cumulative materiality analysis, even though it will not help Smith much.

**4.**

Smith claims that the State failed to disclose documents relating to David McGruder, the cook at the Hogley Wogley BBQ, that contained information favorable to the defense. Those documents are the prosecutor's synopsis of his sworn interview with McGruder and three police reports from March and April 1983. The prosecutor's synopsis notes that the description McGruder gave of the

two men he saw outside the Hogley Wogley fit Smith and Johnson except that his weight estimate for Smith was off by thirty pounds. The synopsis was dated April 4, 1983.[10]

The information in the police reports shows that Smith was actually as much as seventy-five pounds heavier than the man McGruder described to police. The police report dated April 8 also shows that after he had identified Smith in a photopak on that date, McGruder remained "not positive" of the identification. Smith argues that the undisclosed police reports and synopsis cast doubt on McGruder's identification of Smith as the man he saw get into the cab on the night of the murder.

The Florida Supreme Court found that the synopsis should have been disclosed but held that it was not material under Brady. It pointed out that at the 1990 trial Smith's counsel cross-examined McGruder in depth about his identification of Smith. That cross-examination exposed inconsistencies in McGruder's testimony about the date on which he had identified Smith, Smith's hair style and appearance in the photopack picture, and just how sure McGruder

---

[10] The April 4 synopsis also indicates that McGruder had been "unable to pick either of the defendants out of a photopak." That part of the synopsis was not evidence favorable to the defense, however, because Smith's photograph was not among those that had been shown to McGruder up to that point. Smith, 931 So. 2d at 799. When Smith's picture was included in the photopack on April 8, McGruder did identify it.

40

was about the identification.  See Smith, 931 So. 2d 799.  The court's point was that the jury was aware McGruder was somewhat confused and unsure of the identification.  Additionally, the fingerprint from the phone at the Hogley Wogley—a piece of evidence untainted by any allegation of impropriety—supports McGruder's identification.  In light of these facts, the Florida Supreme Court's determination that the synopsis was not by itself enough to be material—not enough to undermine our confidence in the guilty verdict—is reasonable.  Nonetheless, because the synopsis was somewhat favorable to Smith and was not disclosed, it is due to be considered in the cumulative materiality analysis.

The evidence in the police reports about the seventy-five pound weight difference and McGruder not being positive of his identification of Smith is also due to be considered in that analysis.

**5.**

Smith claims that the State failed to disclose that witnesses Melvin Jones and Derrick Johnson, who did not otherwise know each other, had met in jail before the 1983 trial.  Smith argues that the prosecutor had learned in September 1983 that on July 11 of that year Melvin Jones approached Johnson in a holding cell, showed him a map of the crime scene, and offered to help him in connection

41

with the case. The prosecutor's brief note about that encounter was not disclosed to the defense. At the Florida trial court hearing during the collateral proceeding, the State conceded that this evidence met the first two prongs of Brady because it was favorable and was not disclosed to Smith. Id. at 797.

The Florida Supreme Court held that the evidence of Jones and Johnson's encounter was not, alone, material. Id. That conclusion was reasonable. As the court noted, Smith's defense at the trial was that he was not in the taxi on the night of the murder and that Jones and Johnson must have colluded to frame him. Jones and Johnson did not know each other at the time of the murder. In addition, the defense's theory was that Johnson got Jones to lie for him, but the undisclosed information shows that Jones approached Johnson, not the other way around. It also shows that Jones' approach unsettled Johnson. Johnson was so unnerved that he had been approached by a stranger who knew details about the crime that he immediately called the guards and asked to be removed from the holding cell. Id. Thus, during their brief encounter Jones and Johnson did not actually discuss the facts of the case. Smith, 931 So. 2d at 797.

In view of the circumstances, it is reasonable for the Florida Supreme Court to have found that the brief encounter between Jones and Johnson, initiated by Jones in a holding cell months after the crime, was too thin a basis to construct a

42

strong argument that the two cooked up the entire story to frame Smith. Considered by itself, evidence that Jones and Johnson met briefly in a holding cell considered is not enough to undermine our confidence in the guilty verdict. It is, however, evidence that is due to be considered for whatever it is worth in the cumulative materiality analysis.

## 6.

Finally, Smith claims that several police reports contain impeachment evidence against Priscilla Walker. One of those reports indicates that Walker told police in 1988 that on the night of the murder, Smith had returned to her house around 1:00 a.m. and remained there until 5:00 a.m. That statement conflicts with undisclosed statements made by other people who stated that Smith was elsewhere by around 1:30 a.m. that morning. This evidence is due to be considered at the cumulative materiality stage.[11]

## VI.

The Supreme Court held in Kyles that the third component of the Brady/Bagley test, which is the materiality analysis, must be conducted in a way

---

[11] Smith also claims that another report, one by Officer Kewin dated March 23, 1983, indicates that when Walker and James Matthews were first interviewed "they gave no info" to police. Walker explained, however, that she gave no information about Smith because she was not asked. Because her explanation is uncontradicted, the information in that police report is not favorable to Smith.

43

that considers the cumulative impact of all of the undisclosed evidence favorable to the defense. Kyles, 514 U.S. at 436, 115 S. Ct. at 1567 ("The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item."). The Court explained: "We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion." Id. at 437 n.10, 115 S. Ct. at 1567 n.10; see also Brown v. Head, 272 F.3d 1308, 1316 (11th Cir. 2001) (In performing a cumulative materiality analysis, "the collective impact of all of the suppressed evidence must be considered against the totality of the circumstances") (citing Kyles, 514 U.S. at 441, 115 S. Ct. at 1569).

We have explained that the analytical process of gauging materiality begins with determining the force and effect of each individual item of favorable evidence not disclosed to the defense. While the "materiality determination must consider the aggregate effect of all the suppressed evidence . . . [t]hat does not mean . . . that an individual assessment of each piece of suppressed evidence is somehow inappropriate. Indeed, the only way to evaluate the cumulative effect is to first examine each piece standing alone." Maharaj, 432 F.3d at 1310 (internal citation omitted). But it is essential that the process not end after each undisclosed

44

piece of evidence has been sized up. The process must continue because <u>Brady</u> materiality is a totality-of-the-evidence macro consideration, not an item-by-item micro one. The most common error courts make in conducting the <u>Brady</u> materiality analysis is to stop half way through the process—they consider the force and effect of the undisclosed evidence one item at a time but do not consider it cumulatively. <u>See</u> <u>Kyles</u>, 514 U.S. at 440, 115 S.Ct. at 1569 (finding fault with the court of appeals for its "repeated references dismissing particular items of evidence as immaterial and so suggesting that cumulative materiality was not the touchstone").

Cumulative analysis of the force and effect of the undisclosed pieces of favorable evidence matters because the sum of the parts almost invariably will be greater than any individual part. Whether the sum of the withheld evidence favorable to the defense will be enough to create a reasonable probability that the jury would have acquitted will depend on two factors. One factor is the net inculpatory weight of the evidence on both sides that actually was presented at trial. The other factor is the aggregate effect that the withheld evidence would have had if it had been disclosed. These two factors are brought to bear at the crucial second step of the materiality process, which begins with putting on the scales the evidence that was presented at trial—evidence favoring the prosecution

on one side, that favoring the defense on the other. Then the force and effect of all of the undisclosed exculpatory evidence is added to the weight of the evidence on the defense side, while the force and effect of all the undisclosed impeachment evidence is subtracted from the weight of the evidence on the prosecution's side. Id. at 437, 115 S.Ct. at 1567 (referring to the "responsibility to gauge the likely net effect of all such evidence").

Once the evidence on the scales is adjusted to take into account the combined force and effect of the undisclosed evidence favorable to the defense, the standard that is applied is not one of sufficiency of evidence to convict. It is instead whether what is left on both sides of the scale after adjusting for the withheld evidence creates a reasonable probability that a jury would acquit, and a reasonable probability is one sufficient to undermine our confidence in the guilty verdict. Id. at 453, 115 S.Ct. at 1575 ("[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same."). Of course, the stronger the evidence of guilt to begin with, the more favorable to the defense the undisclosed evidence will have to be to create a reasonable probability that a jury would have acquitted had the evidence been disclosed. See United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996); United

States v. Gonzalez, 93 F.3d 311, 317 (7th Cir.1996); see also United States v. Noriega, 117 F.3d 1206, 1219–20 (11th Cir. 1997). When a federal habeas court conducts or reviews a Brady materiality analysis, it considers in the cumulative weighing process only the undisclosed evidence covered in the Brady claims that are not procedurally barred. See Kelley v. Sec'y, Dep't of Corr., 377 F.3d 1317, 1344 (11th Cir. 2004) ("Thus, the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief."); cf. Ogle v. Johnson, 488 F.3d 1364, 1368 (11th Cir. 2007) ("To have exhausted these eight claims, Ogle had to present the eight instances of ineffective assistance that he now asserts in his federal petition . . . ."); Peoples v. Campbell, 377 F.3d 1208, 1239 (11th Cir. 2004) ("[W]e agree with the district court's statement of law that a habeas petitioner may not present instances of ineffective assistance of counsel in his federal petition that the state court has not evaluated previously." (internal quotation marks omitted)). Considering undisclosed evidence that a petitioner failed to properly present in a Brady claim in the state courts would undermine the important policies behind the procedural bar rules. See generally; Lambrix v. Singletary, 520 U.S. 518, 523, 117 S. Ct. 1517, 1522 (1997) (discussing the policies underlying the procedural bar rules); Kelley, 377 F.3d at 1344. Cf. Ogle,

47

488 F.3d at 1368; Peoples, 377 F.3d at 1239. So, in the present case, the only undisclosed evidence to be considered at the cumulative materiality stage is that which was properly raised in the Brady claims Smith brought before the state courts.

After sifting through all of Smith's Brady claims, we decided that there are six of them that are not procedurally barred and that do involve favorable evidence that was actually suppressed. See Part V.B., supra. To recap, those six Brady claims are the ones involving evidence that: (1) Melvin Jones sought help from the prosecutor with the probation violation and grand theft charges against him; (2) Melvin Jones, fearing arrest, sought help from the prosecutor in regard to the sexual abuse allegations his daughter was making against him; (3) one or more police reports indicated that Melvin Jones had initially been considered as a suspect in 1983; (4) a prosecutor's synopsis of an interview of David McGruder and some police reports cast doubt on McGruder's identification of Smith; (5) a prosecutor's note indicated that Jones and Johnson had met briefly in a holding cell before the 1983 trial; and (6) several reports showed that Priscilla Walker's statement to the police about when Smith was at her house conflicted with statements by others about where he was during that time.

48

Because of AEDPA, 28 U.S.C. § 2254(d), we first ask whether the Florida

Supreme Court reasonably decided that those six pieces of withheld evidence,

considered cumulatively, were not material.[12]  We conclude that court did not

reasonably decide this issue because it did not decide this issue at all.   There is

room for debate about whether the Florida Supreme Court performed any

cumulative analysis of the favorable evidence it found had been withheld from the

defense.  See Smith, 931 So. 2d at 797–799.  However, there is no room for debate

about whether that court performed a cumulative materiality analysis of all six of

the pieces of favorable evidence we have concluded were withheld from the

defense.  As we have pointed out, the Florida Supreme Court unreasonably

determined that the fact Melvin Jones had talked with the prosecutor before the

1990 trial about his fears that he would be charged with the sexual abuse of his

daughter was not impeachment evidence under Brady.  See Part V.B.2, supra.  For

that reason the court did not consider that evidence in conducting its materiality

analysis, whether that analysis was cumulative or not.  It follows that we cannot

defer to its decision about whether the withheld evidence was material.  See

_____

[12]  The Kyles decision was issued in 1995.  The Florida Supreme Court's decision in this case that affirmed denial of collateral relief on the Brady claims was issued in 2006.  See Smith v. State, 931 So. 2d 790 (Fla. 2006).  So the Kyles cumulative materiality rule was "clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of § 2254(d)(1).

Panetti v. Quarterman, 551 U.S. 930, __, 127 S. Ct. 2842, 2858–59 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").

We could conduct the cumulative materiality analysis involving the six pieces of withheld evidence ourselves, but we think it would be beneficial to remand the case so that the district court can do that in the first instance. The district court has not yet performed that analysis and in the circumstances of this case we think that resolution of the issue will benefit from a two-tiered consideration.[13]

## VII.

Smith also contends that his defense counsel rendered ineffective assistance of counsel during the guilt phase of his trial. See generally Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). To satisfy the Strickland

---

[13] Smith's renewed motion to hold this appeal in abeyance pending completion of his Rule 3.851 proceeding in state court is denied.

We leave entirely to the discretion of the district court on remand whether to hold in abeyance further proceedings in that court pending the completion of some or all stages of the pending state court proceeding.

standard, Smith must first demonstrate that his counsel's performance was deficient, which means that it "fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. To do so Smith must overcome a strong presumption that his counsel's performance fell within the broad range of "reasonable professional assistance," and he must prove any necessary facts by a preponderance of the evidence. Id. at 689, 104 S. Ct. at 2065; Chandler v. United States, 218 F.3d 1305, 1313–15 (11th Cir. 2000) (en banc) (explaining that a defendant must show that "no competent counsel would have taken the action that his counsel did take"). Second, Smith must show that there is a reasonable probability there would have been a different verdict but for his counsel's unprofessional errors. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is one sufficient to undermine our confidence in the verdict. Id.

Under AEDPA our task is to decide whether the Florida courts' rejection of Smith's ineffective assistance claims is contrary to, or an unreasonable application of, "clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); Marquard, 429 F.3d at 1304. The district court concluded that the Florida Supreme Court did not unreasonably apply clearly established federal law. We review that judgment de novo. Hall, 310 F.3d at 690.

51

**A.**

Smith's first ineffective assistance of counsel claim involves his trial counsel's failure to present the testimony of alibi witnesses. He says that his friends Khan Campbell, James Hawkins, and Dina Watkins all saw him at Norm's Bar at 11:30 p.m. on the night of the murder. Trial counsel knew those three people would testify to that, but he chose not to call them as witnesses because he believed they were lying.

The Florida Supreme Court held that this claim "was not raised below and is therefore not preserved for appellate review." Smith, 931 So. 2d at 802. As the court noted, a related claim by Smith attributed his counsel's failure to call Campbell and Hawkins to a conflict of interest. However, that claim was barred because it had not been raised on direct appeal. Id. The result was that the Florida Supreme Court found procedurally barred all variations of Smith's claim that his alibi witnesses should have been called to testify. Smith does not contend that he can escape the effect of the procedural bar in this federal habeas proceeding by showing either cause and prejudice or a fundamental miscarriage of justice. See

52

<u>Coleman</u>, 501 U.S. at 730, 111 S. Ct. at 2554;  <u>Mize</u>, 532 F.3d at 1190.  The claim is barred from review here.[14]

## B.

Smith claims that his trial counsel was ineffective for failing to properly investigate and cross-examine FBI Agent Donald Havekost, who testified as an expert witness against Smith at his 1990 trial.  At the time of his testimony Havekost had been accepted as an expert in the field of lead compositional analysis and had been allowed to testify as one in hundreds of trials.  Based on his expertise Havekost testified that he was "unable to distinguish" between the bullet fragment found in Songer's clothing and the bullets from the box found in Smith's uncle's house.  He gave his opinion that the fragment and the bullets "originated from a common source."  When asked whether that compositional similarity could

[14] Two additional points deserve mention.  First, attorneys are not required to violate ethical standards to serve their client's ends.  A defendant has no constitutional right to have his attorney present evidence that the attorney believes is false.  <u>See</u>  <u>Nix v. Whiteside</u>, 475 U.S. 157, 171, 106 S.Ct. 988, 996 (1986) (an attorney's refusal to assist in the presentation of perjury and his threat to withdraw if the defendant took the stand and lied "falls well within accepted standards of professional conduct and the range of reasonable professional conduct acceptable under <u>Strickland</u>"); <u>Davis v. Singletary</u>, 119 F.3d 1471, 1475 ("The duty to render effective assistance of counsel does not include the duty to present false or misleading testimony.").

Second, the questionable testimony would not have provided Smith with much of an alibi even if it were true.  Norm's Bar is across the street from the Hogley Wogley BBQ where the call to the cab was made shortly after midnight and where Smith met the cab.

have occurred by chance, Havekost dismissed the possibility as "essentially nothing." Smith argues that his trial counsel should have better prepared himself for that testimony and attacked the scientific basis of Havekost's testimony, which has since been called into some doubt.

The Florida Supreme Court decided that the performance of Smith's counsel in this respect was not deficient. Smith, 931 So. 2d at 801 ("Smith failed to meet the first prong of the Strickland standard."). The court acknowledged that twelve years after the 1990 trial, at the state collateral hearing Smith presented another expert who testified about the flawed nature of Havekost's testimony. But, as the Florida Supreme Court explained:

> The evidence presented at the evidentiary hearing amply demonstrated that Smith's trial counsel hired an expert to examine the scientific evidence in question and to challenge it. The expert, however, found no problems with the FBI analysis. In addition, defense counsel himself researched the FBI's scientific methodology. Finally, Smith's expert admitted at the post-conviction hearing that no research, including his own, was available to challenge the FBI evidence at the time of retrial. Accordingly, Smith failed to meet the first prong of the Strickland standard.

Id. at 801. That conclusion is entirely reasonable. Just as counsel are not required to anticipate changes in the law, neither are they required to anticipate changes in science. See LeCroy, 421 F.3d at 1261 n.27; Tarver v. Hopper, 169 F.3d 710, 714 (11th Cir. 1999); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994); see

54

also <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.")

## C.

Smith claims that his counsel was ineffective for failing to locate and interview Ventura Gibson and present his testimony. Melvin Jones testified in a deposition before the 1983 trial that Gibson had given him a ride home on the night of the murder and had dropped him off near his house shortly before Songer's cab arrived. Gibson was never contacted during the defense's preparation for either the 1983 or the 1990 trial. During the state collateral proceeding in 2002 Gibson was asked these questions and gave these answers:

> Q. Do you recall ever taking Melvin Jones from 27th Street and 18th Avenue over to Fairfield Avenue South?
> A. No, I can not.
> Q. Do you ever recall taking Melvin Jones or driving him anywhere?
> A. No.

On cross-examination this exchange took place:

Q. And just so the record is clear, your testimony today is you do not recall whether or not you gave Melvin Jones a ride in March of 1983; isn't that your testimony today?

A. Yes, I did not give him a ride.

Q. No, sir. I'm asking you on direct examination didn't you say you do not recall?

A. I do not recall giving him a ride; no.

Q. You could have, but you don't recall?

A. No, I did not give him a ride.

Later on Gibson testified: "I don't remember taking Melvin to Fairfield." Asked whether it was correct that he simply did not remember one way or the other because it had been nineteen years, Gibson said: "I'm not taking Melvin nowhere."

Trial counsel admitted that he had made no effort to contact Gibson to check Jones' story about how he had arrived at the crime scene. Smith argues that because Jones was such an important witness counsel's failure to find and present Gibson as a witness to impeach one aspect of Jones' testimony was deficient performance that prejudiced the defense.

The Florida Supreme Court decided that Smith had failed to meet either Strickland prong for this claim. Smith, 931 So. 2d at 801. It thought that counsel's failure to interview Gibson was not a serious error because any question

56

about how Jones arrived at the crime scene was a "minor, collateral" issue. <u>Id.</u>

We need not consider whether the Florida Supreme Court's conclusion about the

performance component was reasonable, because we are convinced of the

reasonableness of its alternative conclusion that there was no prejudice. <u>See id.</u>

There was nothing unusual about Jones being on a public street near where the

crime occurred, and how he came to be there is not a critical fact. The possibility

of a swearing match about that matter does not matter; it is not enough to

undermine our confidence in the guilty verdict. More precisely, it was not

unreasonable for the Florida Supreme Court to decide that there is no reasonable

probability of a different result if Gibson had been presented as a witness.

Our decision to assume our way past the performance question and decide

this ineffective assistance of counsel claim on the alternative ground of no

prejudice implicates another argument of Smith's. He contends that the prejudice

inquiry for ineffective assistance claims and for <u>Brady</u> claims must be combined

so that any prejudice from deficient performance of counsel and any prejudice

from the failure to disclose evidence favorable to the defense must be considered

cumulatively. <u>See</u> <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1206–07 (10th Cir. 2003)

(noting the Tenth Circuit's practice of aggregating all errors in cumulative

analysis, even those based on diverse legal claims, including <u>Strickland</u> and <u>Brady</u>).

The district court did not consider that argument because it was not fairly presented. Only one sentence in Smith's 116-page petition for a writ of habeas mentioned the possibility of inter-claim cumulative analysis and no authority was cited for it. Smith did not even allude to the argument in his combined 123-page memoranda of law in support of his petition. That is not adequate presentation of the issue. <u>See</u> <u>United States v. Massey</u>, 443 F.3d 814, 819 (11th Cir. 2006) (an issue was not adequately presented unless it was raised in a way that the district court could not misunderstand it); <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); <u>cf.</u> <u>Flanigan's Enters. Inc. v. Fulton County</u>, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that an argument was waived because the appellants "fail[ed] to elaborate or provide any citation of authority in support of" the argument in their brief). Because the issue or argument was not properly presented to the district court, we will not decide it. <u>See</u> <u>Johnson v. United States</u>, 340 F.3d 1219, 1228 n.8 (11th Cir. 2003) ("Arguments not raised in the district court are waived."); <u>Hurley v. Moore</u>, 233 F.3d 1295, 1297–98 (11th Cir. 2000); <u>Nyland v. Moore</u>, 216 F.3d 1264, 1265 (11th Cir. 2000); <u>Redwing Carriers, Inc. v. Saraland Apartments</u>, 94

F.3d 1489, 1511 n.30 (11th Cir. 1996); <u>Walker v. Jones</u>, 10 F.3d 1569, 1572 (11th

Cir. 1994).

## VIII.

In conclusion, the district court's judgment denying the habeas petition is

AFFIRMED except as it concerns six <u>Brady</u> claims.  Those six <u>Brady</u> claims are

the ones enumerated supra at 49 and discussed in Part V. B., supra.  As to those

six <u>Brady</u> claims the district court's judgment is VACATED and the case is

REMANDED for the limited purpose of having the district court conduct for those

six claims a cumulative prejudice analysis as required by the <u>Kyles</u> decision, 514

U.S. at 434, 115 S. Ct. at 1566, and as directed by this opinion.  Depending on the

outcome of that analysis, the district court should then enter a new judgment either

granting or denying the habeas petition.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR

FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.